# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP307 |

| | |
|---|---|
| COMPLETE TITLE: | Gregory M. Backus,<br>　　　　Plaintiff-Respondent,<br>　　v.<br>Waukesha County,<br>　　　　Defendant-Appellant. |

ON CERTIFICATION FROM THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | July 5, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 6, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Waukesha |
| JUDGE: | Michael O. Bohren |

JUSTICES:

KAROFSKY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and HAGEDORN, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the defendant-appellant, there were briefs filed by *Deborah B. Price*, principal assistant corporation counsel. There was an oral argument by *Deborah B. Price*.

For the plaintiff-respondent, there was a brief filed by *Erik S. Olsen, Andrew D. Weininger* and *Eminent Domain Services, LLC*, Madison. There was an oral argument by *Andrew D. Weininger*.

An amicus curiae brief was filed by *Scott E. Rosenow* and *WMC Litigation Center*, Madison for Wisconsin Manufacturers and Commerce, Inc.

An amicus curiae brief was filed by *Clayton P. Kawski*, assistant attorney general, with whom on the brief was *Joshua L. Kaul*, attorney general, for the Wisconsin Department of Transportation.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP307
(L.C. No. 2018CV1379)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Gregory M. Backus,**

    **Plaintiff-Respondent,**

  **v.**

**Waukesha County,**

    **Defendant-Appellant.**

**FILED**

**JUL 5, 2022**

Sheila T. Reiff
Clerk of Supreme Court

KAROFSKY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, and HAGEDORN, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined.

APPEAL from an order of the Circuit Court for Waukesha County, Michael O. Bohren, Judge. *Reversed and cause remanded.*

¶1 JILL J. KAROFSKY, J. The court of appeals certifies the following question to us: In light of 118th Street Kenosha, LLC v. DOT, 2014 WI 125, 359 Wis. 2d 30, 856 N.W.2d 486, is a temporary limited easement compensable under Wis. Stat. § 32.09(6g) (2019-20)?[1] This question arises from a dispute over

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

the proper compensation for a temporary limited easement (TLE) that Waukesha County acquired over Gregory Backus's property to construct a highway bypass along the Backus property's rear lot line. Specifically, the County believes it need pay Backus only the rental value of the TLE. Backus disagrees, arguing that under § 32.09(6g) he is entitled to severance damages measured by the difference between the fair market value of the whole property before and after the completion of the project. In answering the certified question, we hold that § 32.09(6g) does not apply to TLEs. Having answered the question, we remand the cause back to the circuit court for further proceedings consistent with our holding.

## I. BACKGROUND

¶2 The Waukesha West Bypass Project (the Project) reconstructed, relocated, and expanded five miles of County Trunk Highway TT, which abuts the backyard of Backus's residential property. The Project had been in the making for over 50 years. The highway itself was constructed on land already owned by the County, and in 2004 the Heritage Hills Subdivision Plat recorded an easement (HHS Easement) for highway and sidewalk slopes running the length of Backus's property and extending approximately 25 feet into his backyard.[2]

¶3 As part of the Project, in 2016 the County separately acquired a TLE over 0.032 acres of the easternmost portion of

_____

[2] The HHS Easement was originally obtained by the City of Waukesha and was subsequently transferred to Waukesha County in 2016.

Backus's property, the entirety of which fell within the existing HHS Easement. The TLE stated that it was for the purposes of ingress and egress, operation of machinery, grading or creation of slopes, placement or removal of soil, and to remove or plant vegetation.[3] The County terminated the TLE at the completion of the Project.

¶4 Backus seeks compensation from the County for the TLE, alleging a series of permanent damages to his property that he claims are attributable to the TLE.[4] We limit this opinion to answering the certified question and thus do not reach any issue relating to Backus's specific damages.

¶5 The Waukesha County Condemnation Commission awarded Backus compensation for the TLE, but Backus appealed the amount to the circuit court.[5] At the circuit court, Backus presented a

---

[3] The exact relevant language is as follows: "A Temporary Limited Easement for the public purpose and right to construct a highway project, including the placement or removal of soil, grading of roadway slopes, and the creation of fill or cut slopes in the temporary limited easement area to match the new roadway grade, as well as the right of ingress and egress as long as required for the construction of the highway project, including the right to preserve, protect, remove or plant thereon any vegetation that the highway authorities may deem necessary or desirable."

[4] The County filed a motion to strike portions of Backus's brief that reference some of these damages, contending the referenced damages are unsupported by the record. The motion further asks to strike references to the Petition and Complaint of a subsequently filed lawsuit not before the circuit court. These facts and arguments are relevant only to issues of damages which we do not reach in this limited opinion. Thus, we deny the motion to strike as inconsequential.

[5] The Honorable Michael O. Bohren of the Waukesha County Circuit Court presided.

3

before-and-after valuation of his property showing its value dropped from $308,000 to $217,300 after the project was completed. He claimed he was owed the difference in value as severance damages under Wis. Stat. § 32.09(6g). He then added a $1,705 rental value for the TLE, for a total demand of $90,700 (rounded) in damages.

¶6 The County moved for summary judgment. For the purposes of the motion, the County stipulated that it owed Backus the $1,705 in rental value. But it argued that the severance damages——measured by the diminution in the fair market value——were not compensable under our 118th Street decision because the Project as a whole caused the diminution in fair market value, not the TLE. The circuit court denied the summary judgment motion, concluding that 118th Street did not foreclose the possibility of severance damages for a TLE, which raised disputed issues of material fact.

¶7 The County obtained leave to file this interlocutory appeal of the denial of its summary judgment motion. The court of appeals then certified to us, and we accepted, the question left open in 118th Street: is a TLE compensable under the valuation methodology in Wis. Stat. § 32.09(6g)?

## II. ANALYSIS

¶8 The certified question presents a straightforward issue of statutory interpretation that we review de novo. See Bauer v. Wis. Energy Corp., 2022 WI 11, ¶11, 400 Wis. 2d 592, 970 N.W.2d 243. There is no dispute that a TLE is compensable; the question before us is whether that compensation is to be

4

calculated under the method set forth in Wis. Stat. § 32.09(6g). We begin with a brief recap of 118th Street, which teed up the issue in this case. We then explain how the plain language of § 32.09(6g) does not allow for the valuation of temporary easements.

¶9 In 118th Street, the Department of Transportation (DOT) obtained a TLE to build a new driveway to connect a commercial property to a different street after DOT's relocation of 118th Avenue caused the commercial property to lose access to the avenue. 118th Street, 359 Wis. 2d 30, ¶11. As a result, the commercial property's fair market value declined and the LLC that owned the commercial property sought compensation for the diminution in value under § 32.09(6g). Id., ¶12. In a footnote, the majority acknowledged that there are at least three reasons why § 32.09(6g) may not apply to TLEs at all: (1) the statute references "easements" and not "temporary limited easements"; (2) the before-and-after valuation creates confusion because it may fail to capture the temporary nature of a TLE; and (3) TLEs terminate upon completion of the project and thus the "after" valuation would leave no avenue for compensation for the TLE no longer in effect. Id., ¶36 n.12. Nonetheless, the opinion assumed without deciding that a TLE was compensable under § 32.09(6g). Id., ¶58. We ultimately concluded that the project as a whole caused the diminution in value, not the TLE used to construct the driveway. Id., ¶61. Now we take the opportunity to more fully analyze whether § 32.09(6g) applies to TLEs.

¶10 We begin with the language of § 32.09(6g), which reads:

> In the case of the taking of an easement, the compensation to be paid by the condemnor shall be determined by deducting from the fair market value of the whole property immediately before the date of evaluation, the fair market value of the remainder immediately after the date of evaluation, assuming the completion of the public improvement and giving effect, without allowance of offset for general benefits, and without restriction because of enumeration but without duplication, to the items of loss or damage to the property enumerated in sub. (6)(a) to (g) where shown to exist.

We interpret this statute by looking to the text's plain meaning, giving the words their "common, ordinary, and accepted meaning." See, e.g., Cree Inc. v. LIRC, 2022 WI 15, ¶16, 400 Wis. 2d 827, 970 N.W.2d 837; Wis. Stat. § 990.01(1).

¶11 Section 32.09(6g) concerns easements. In Garza v. Am. Transm. Co., we stated that "an easement grants a right to use another's land." 2017 WI 35, ¶23, 374 Wis. 2d 555, 893 N.W.2d 1. The Wisconsin DOT Real Estate Program Manual sets out two categories of easements that can be acquired for eminent domain[6] projects: permanent easements and TLEs. See Wisconsin DOT Real Estate Program Manual 2.4.6.3-2.4.6.4 (updated Mar. 2020). The manual describes a TLE as "an interest in land that is limited in purpose and time." In the specific context of a taking by eminent domain, the purpose of a TLE is "for construction," and

---

[6] Eminent domain is "the inherent power of a governmental entity to take privately owned property, esp. land, and convert it to public use, subject to reasonable compensation for the taking." Eminent Domain, Black's Law Dictionary (11th ed. 2019).

all TLEs "expire at the completion of the construction project." Id. at 2.4.6.4.

¶12 Section 32.09(6g) establishes that compensation for the "taking of an easement" be measured by "deducting from the fair market value of the whole property immediately before the date of evaluation, the fair market value of the remainder immediately after the date of evaluation, assuming the completion of the public improvement." Although the statute does not label it as such, this before-and-after valuation of the whole property incorporates what is known as "severance damages." Severance damages are defined as "compensation awarded to a landowner for the loss in value of the tract that remains after a partial taking of the land." Damages: severance damages, Black's Law Dictionary 491 (11th ed. 2019); see also Brenner v. New Richmond Reg'l Airport Comm'n, 2012 WI 98, ¶13 n.5, 343 Wis. 2d 320, 816 N.W.2d 291; 9 Nichols on Eminent Domain § 14.02[2] (2021) ("In a before and after calculation, severance damages are not separately calculated but are automatically factored into the calculation of the value of the reminder after the taking[.]").[7]

¶13 Facially, § 32.09(6g) does not differentiate between a TLE and a permanent easement, and thus both Backus and the County maintain that the statute applies to all easements——temporary and permanent alike. That said, we are "not bound by the parties' interpretation of the law or obligated to accept a

_____

[7] The parties also refer to this as "proximity damages."

7

party's concession of law." State v. Carter, 2010 WI 77, ¶50, 327 Wis. 2d 1, 785 N.W.2d 516. In this case, DOT offered an amicus brief arguing that the statute does not apply to TLEs. DOT contends that TLEs should be compensated according to the Wisconsin Constitution and common law principles.[8]

¶14 We agree with DOT and hold that portions of § 32.09(6g) necessarily limit its application to permanent easements alone. As a practical matter, § 32.09(6g)'s before-and-after valuation methodology is a poor fit for TLEs. As the definitive treatise on eminent domain law explains "[t]he valuation of permanent easements is a difficult task and the valuation of temporary easements is even more difficult," and while the before-and-after valuation method is typical for permanent easements, it does not "logically apply to valuing temporary easements because [that] method attempts to measure permanent reductions in fair market value." See Nichols § G32.08[1][a] & [1][e].

¶15 The language of § 32.09(6g) also conflicts with that provision's application to TLEs. The term "remainder," as contrasted with "whole property," is particularly informative as the former denotes that the property has been divided or severed in some way. See Remainder Oxford English Dictionary ("[T]hat which remains when a part has been taken away, used, or otherwise dealt with; the rest," or "the remaining part or

---

[8] See Wis. Const. art. I, § 13.

fragment of something.").[9] But a TLE takes land only for temporary use; all portions of the land and related rights remain under the property owner's control upon the TLE's termination. See Nichols § G32.01[3] (delineating that one difference between temporary and permanent takings is that in temporary takings, "after the taking period expires, the landowner's legal interest and occupation is reestablished"). Without a continuing division or severance of land, what "remainder" is there to value?

¶16 TLEs are further inconsistent with the statutory language setting out the benchmark for the before-and-after valuations. The "before" value captures the value of the whole property immediately before the easement is recorded. The "after" value is calculated assuming "the completion of the public improvement." § 32.09(6g). But by definition all TLEs expire upon completion of the public improvement, so to assume the completion of the public improvement is to also assume the termination of the TLE. In other words, the "before" value captures the value of the property before the TLE exists and the

_____

[9] Although the use of "remainder" in this context may be susceptible to a technical, industry specific definition, treatises and guides appear to use the term consistent with this common and ordinary meaning to reference what is left after a partial taking. See, i.e., 9 Nichols on Eminent Domain § 14.02[3][c][iv] (2021) ("When a partial taking reduces the size or shape of the remainder to such a degree that it negatively affects what can be constructed on the remainder in the after, the owner has been damaged."); Wisconsin DOT Real Estate Program Manual 2.4.1.1 ("The appraiser must keep in mind that valuing the part taken as a separate entity results in a total taking. There is no remainder[.]").

"after" value assumes the TLE has ceased to exist. A before-and-after valuation therefore never captures the actual value of the TLE while it exists. Instead, the before-and-after valuation will capture the effect the public improvement project as a whole has on the fair market value of the property, which is not the correct compensation amount. See 118th Street, 359 Wis. 2d 30, ¶43 (stating that easement damages "are limited to those caused by the easement at issue").

¶17 That is precisely what happened in this case. Backus's expert evaluated the fair market value of the property before the Project began and after the Project was completed by using comparable sales from the area that were also affected by the Project. But this method captured the value of the property before the TLE was recorded and after the TLE was terminated. As such, the expert captured and compared the value of the exact same property interests——the whole property burdened with the HHS Easement but not the TLE. Logically, this before-and-after valuation cannot represent the value of the TLE because the TLE never factors into the equation. This is a stark example of why a TLE cannot be compensated under the before-and-after fair market value method of § 32.09(6g).

¶18 Finally, even though subsec. (6g) incorporates the possibility of non-duplicative recovery for items of loss or damages listed in § 32.09(6)(a)-(g), those items contemplate permanent losses or involve damages from "actual severance of land" and thus would compensate for only limited aspects of a

10

TLE.[10] Indeed, appraisers regularly rely on § 32.09(6g)'s "without restriction because of enumeration" language to use common unenumerated valuation methods that better capture a TLE's value. In this case, for example, both Backus and the County considered the TLE's rental value despite rental value being absent from § 32.09(6)'s enumerated list. However, the availability of an unrestricted list of additional damages in § 32.09(6) does not cure the fact that § 32.09(6g) <u>requires</u> a

---

[10] Items of loss or damage listed in Wis. Stat. § 32.09(6)(a)-(g) are as follows:

(a) Loss of land including improvements and fixtures actually taken.

(b) Deprivation or restriction of existing right of access to highway from abutting land . . . .

(c) Loss of air rights.

(d) Loss of a legal nonconforming use.

(e) Damages resulting from actual severance of land including damages resulting from severance of improvements or fixtures and proximity damage to improvements remaining on condemnee's land. In determining severance damages under this paragraph, the condemnor may consider damages which may arise during construction of the public improvement, including damages from noise, dirt, temporary interference with vehicular or pedestrian access to the property and limitations on use of the property.

 . . .

(f) Damages to property abutting on a highway right-of-way due to change of grade where accompanied by a taking of land.

(g) Cost of fencing reasonably necessary to separate land taken from remainder of condemnee's land . . . .

before-and-after valuation and before-and-after valuations logically do not capture the value of a TLE.[11]

¶19 Given that the method listed in § 32.09(6g) cannot capture the value of a TLE, the far more reasonable reading of that statute is that it applies only to easements that continue to exist beyond the completion of a public improvement project. Therefore, § 32.09(6g) does not apply to TLEs, which must instead be compensated under constitutional and common law principles.[12]

### III. CONCLUSION

¶20 Because the text of Wis. Stat. § 32.09(6g) is incompatible with the valuation of a TLE, we hold that compensation for a TLE is not calculated under the methodology of § 32.09(6g).

*By the Court.*—Reversed and cause remanded.

---

[11] The statutory language says that "the compensation to be paid by the condemnor shall be determined by" the before-and-after analysis. § 32.09(6g)(emphasis added). The word "shall" is generally presumed mandatory when it appears in a statute. See State v. Fitzgerald, 2019 WI 69, ¶25 n.8, 387 Wis. 2d 384, 929 N.W.2d 165.

[12] To be abundantly clear, this opinion does not limit a property owner's access to compensation for any provable damages caused by a TLE. This includes, but is not limited to elements of value currently included in the WI DOT Real Estate Program Manual section 2.4.6.4 such as the rental value of the TLE and damages for permanent loss of site improvements within the TLE. We do not speculate about the extent of Backus's damages.

¶21 REBECCA GRASSL BRADLEY, J. *(dissenting).* The certified question in this case has an obvious answer; in fact, both parties agree that a temporary limited easement (TLE) is compensable under Wis. Stat. § 32.09(6g). Section 32.09(6g) begins with the phrase, "[i]n the case of the taking of an easement[.]" (Emphasis added.) Ignoring this clear language, the majority errs by inserting the word "permanent" in front of the word "easement." The majority usurps the legislature's lawmaking power with this rewrite of duly enacted law.[1] See, e.g., State v. Neill, 2020 WI 15, ¶23, 390 Wis. 2d 248, 938 N.W.2d 521 ("One of the maxims of statutory construction is that courts should not add words to a statute to give it a certain meaning." (quoting Fond Du Lac County v. Town of Rosendale, 149 Wis. 2d 326, 334, 440 N.W.2d 818 (Ct. App. 1989))).

¶22 The majority also disregards Wis. Stat. § 32.09(intro.) which states, "[i]n all matters involving the determination of just compensation in eminent domain proceedings, the following rules shall be followed[.]"[2] (Emphasis added.) Although there are no statutory exceptions,

---

[1] The legislature knows how to refer to a specific subset of easements. See, e.g., Wis. Stat. § (6r)(a) ("In the case of a taking of an easement in lands zoned or used for agricultural purposes . . . ."). It did not qualify the word in any manner in the statute we interpret in this case.

[2] The majority is selective in its interpretation of the word "shall," rendering it optional in Wis. Stat. § 32.09(intro.) but deeming it compulsory in § 32.09(6)(g). See majority op., ¶18 n.11 ("The word 'shall' is generally presumed mandatory when it appears in a statute." (citation omitted)).

1

the majority nevertheless tells Gregory M. Backus (and all similarly situated property owners) their remedies lie beyond the statute, which is unequivocally applicable to "all matters" regarding "just compensation" in an "eminent domain proceeding."[3] Under the majority's restructured statutory scheme, "shall be followed" is rewritten to "may be followed"——if in the majority's view there is a better "fit" somewhere beyond the statute.

¶23 The majority also threatens individual freedom by eroding private property rights. Even though Backus claims to have suffered substantial damages, the majority's statutory rewrite will likely limit Backus' damages to merely $1,705 for the purported "rental value" of the interest taken in his property. The majority takes diminution in fair market value off the table based on its misguided sense that the legislature's formula for compensating a TLE taking is inadequate. Its misinterpretation of the law calls into question the constitutionality of Wisconsin's scheme for just compensation in cases of TLEs. See generally 1 William Blackstone, Commentaries *135 (explaining the State is "oblige[d]" to pay property owners "a reasonable price" when it "indulges" its great power of eminent domain).

¶24 In recognition of the primacy of private property rights as a first principle, the Takings Clause of the Fifth Amendment to the United States Constitution provides: "[N]or shall private property be taken for public use, without just

---

[3] Id., ¶19.

compensation."[4]  This constitutional protection of property rights is "necessary to preserve freedom" and "empowers persons to shape and to plan their own destiny in a world where governments are always eager to do so for them." Murr v. Wisconsin, 582 U.S. __, 137 S. Ct. 1933, 1943 (2017). "The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom.  As John Adams tersely put it, '[p]roperty must be secured, or liberty cannot exist.'"  Cedar Point Nursery v. Hassid, 594 U.S. __, 141 S. Ct. 2063, 2071 (2021) (quoting Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851)); see also Wilkinson v. Leland, 27 U.S. 627, 657 (1829) (Story, J.) ("The fundamental maxims of a free government seem to require, that the rights of personal liberty and private property should be held sacred."  (emphasis added)).

¶25 The majority's error stems in part from a fundamental misunderstanding of basic property law principles.  But often motivating a court's decision to disregard the law as written is a desire to improve the legislature's work, which the majority in this case deems unreasonable.  Once again dangerously distorting a canon of statutory construction to achieve a result the majority favors, the majority is oblivious to the damage it inflicts on private property rights.  I dissent.

---

[4] Article I, Section 13 of the Wisconsin Constitution mirrors the language of the Fifth Amendment's Taking Clause: "The property of no person shall be taken for public use without just compensation therefor."  Whether Wisconsin's constitutional guarantee affords greater protection to property owners is beyond the scope of this case.

3

## I. A FINE FIT

¶26 The majority begins its analysis by noting, "[a]s a practical matter, [Wis. Stat.] § 32.09(6g)'s before-and-after methodology is a poor fit for TLEs."[5] This emphasis on "practical[ity]" and "fit" is antithetical to the job of the judge, which is to apply the statute's meaning despite judicial misgivings, not to second-guess the legislature's wisdom in choosing to enact it. Although the majority purports to apply the statute's plain meaning, it couches its explanation for deciding TLEs are something other than easements in consequentialist rather than textual terms, another "transparent revelation of the results-oriented motivations underlying its opinion." Container Life Cycle Mgmt. v. Dep't Nat. Res., 2022 WI 45, ¶78, __ Wis. 2d __, __ N.W.2d __ (Rebecca Grassl Bradley, J., dissenting). The majority rejects the statutory text, which applies——without limitation or qualification——to easements, in favor of a construction the majority thinks will "produce sensible, desirable results, since that is surely what the legislature must have intended. But it is precisely because people differ over what is sensible and what is desirable that we elect those who will write our laws——and expect courts to observe what has been written." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 22 (2012).

¶27 For at least the third time this term, the majority misappropriates the absurd or unreasonable results canon of

---

[5] Majority op., ¶14.

4

statutory construction as a cover for rewriting a statute it deems deficient. "[E]rror-correction for absurdity can be a slippery slope. It can lead to judicial revision of public and private texts to make them (in the judges' view) more reasonable." Id. at 237. "It is a misuse of the canon to invoke it as a tool for discarding the plain meaning of an unambiguous statute in favor of an interpretation" preferred by the majority. Brown County v. Brown Cnty. Taxpayers Ass'n, 2022 WI 13, ¶84, 400 Wis. 2d 781, 971 N.W.2d 491 (Rebecca Grassl Bradley, J., dissenting). "The oddity or anomaly of certain consequences may be a perfectly valid reason for choosing one textually permissible interpretation over another, but it is no basis for disregarding or changing the text." See Scalia & Garner, Reading Law, at 237.

¶28 "Although the absurd or unreasonable results canon applies only rarely and in rather narrow circumstances, many courts cannot resist the temptation to invoke it to justify a preferred outcome." Container Life Cycle Mgmt., __ Wis. 2d __, ¶79. "The absurdity doctrine applies only to textual errors that may be fixed 'by changing or supplying a particular word or phrase whose inclusion or omission was obviously a technical or ministerial error.'" Schwab v. Schwab, 2021 WI 67, ¶44 n.1, 397 Wis. 2d 820, 961 N.W.2d 56 (Rebecca Grassl Bradley, J., dissenting) (quoting Scalia & Garner, Reading Law, at 238); see also State ex rel. Associated Indem. Corp. v. Mortensen, 224 Wis. 398, 402, 272 N.W. 457 (1937) (explaining the unreasonable results canon does "not . . . justify a court in amending the

5

statute or giving it a meaning to which its language is not susceptible merely to avoid what the court believes are inequitable or unwise results").

¶29 In this case, the majority changes the text to exempt TLEs from a statute that facially and when read in context with surrounding statutes unequivocally applies to any sort of easement, whether temporary or permanent. See State v. Grunke, 2008 WI 82, ¶31, 311 Wis. 2d 439, 752 N.W.2d 769 (explaining the unreasonable results canon applies only "when [a different] interpretation would render the relevant statute contextually inconsistent or would be contrary to the clearly stated purpose of the statute"). Wisconsin Stat. § 32.09(6g) does not display any obvious technical or ministerial errors, so the unreasonable results canon cannot justify the majority's insertion of the word "permanent" as a limitation on the types of easements to which the statute applies. Nothing about the statutory language makes it susceptible to such judicial amendment, particularly because the majority's revision also violates the text of § 32.09(intro.) by creating just compensation cases to which the statute does not apply despite an unequivocal command to apply it to "all matters involving the determination of just compensation in eminent domain proceedings[.]"

¶30 "[T]he ideal rule for the honest judge is, 'garbage in/garbage out[.]'" Antonin Scalia, Q&A Justice Antonin Scalia, C-SPAN (July 19, 2012), https://www.c-span.org/video/transcript/?id=8335. "If you're dealing with an inane statute you are duty bound to produce an inane result."

6

Id. Properly interpreted, there is nothing inane about Wis. Stat. § 32.09(6g) or its application to a TLE. The before-and-after methodology actually "fit[s]" just fine, and the majority is wrong to conclude otherwise; however, even if the majority's concerns were valid, the unreasonable results canon would not apply. The unreasonable results canon is not a license to inject judicial policy preferences into the written law. "If courts ignored the law every time they deem a result unreasonable, the rule of law would be supplanted by the rule of judges." Schwab, 397 Wis. 2d 820, ¶44 n.1. "Misapplication of the canon disturbs the constitutional allocation of power among the branches of government." Container Life Cycle Mgmt., __ Wis. 2d __, ¶79.

¶31 Wisconsin Stat. § 32.09(6g) instructs the evaluator to assess the fair market value immediately before the property became encumbered and its value immediately thereafter. Effectively, for a TLE, the evaluator must capture the "[d]iminution of the fair market value of the property during the period of the taking." 9 Nichols on Eminent Domain § G.32.08[1][e] (2021). As this treatise acknowledges, sometimes determining the diminution in fair market value caused by the taking of a TLE is challenging; however, this court is not at liberty to cast aside a statutory command merely because its application may be difficult.

¶32 Consider if Backus were trying to sell his property on the date of the taking, which is the statutory "date of evaluation" for purposes of the fair market value calculations.

7

118th St. Kenosha, LLC v. Wis. Dep't of Transp., 2014 WI 125, ¶37 n.13, 359 Wis. 2d 30, 856 N.W.2d 486 ("The 'date of evaluation' generally is the date on which the easement is acquired."). Before the taking, Backus' property was worth $308,000, so he uses that as the list price. Prospective buyers learn that Waukesha County has a TLE giving it:

> [The] right to construct a highway project, including the placement or removal of soil, grading of roadway slopes, and the creation of fill or cut slopes in the . . . area to match the new roadway grade, as well as the right of ingress and engress as long as required for the construction of the highway project, including the right to preserve, protect, remove or plant thereon any vegetation that the highway authorities may deem necessary or desirable. . . . The above temporary limited easement is to terminate upon the completion of this project or on the day the highway is open to the traveling public, whichever is later.

The fair market value of Backus' property is adversely impacted by the TLE; prospective buyers prefer to purchase unencumbered property. The damage to fair market value in this case may be amplified by the TLE's expansive and unlimited "rights" accorded the government. The "right to construct a highway project" clause is followed by "including," after which the TLE details a non-exhaustive list of what the construction right encompasses. A canon of construction presumes "include" and its derivatives "introduce[] examples" and "not an exhaustive list." Scalia & Garner, Reading Law, at 132. The TLE grants Waukesha County the additional right to make permanent changes to the land (e.g., "remove or plant thereon any vegetation"). Although the incursion may be temporary, in some situations the aftereffects

8

are not. Backus alleges this is one of those cases, and in denying Waukesha County's motion for summary judgment, the circuit court properly recognized this disputed issue of fact belongs to the jury to resolve.

¶33 The majority creates the illusion that this TLE was set to terminate upon the completion of the construction project, ignoring the actual terms of the TLE. The majority truncates the TLE's termination language,[6] which provides, "[t]he above temporary limited easement is to terminate upon the completion of this project or on the day the highway is open to the traveling public, whichever is later." (Emphasis added.) By the TLE's own terms, the public improvement could be complete but the TLE would not expire if the highway were not "open to the traveling public[.]" Contrary to the majority's assertion, "all TLEs" do not "expire at the completion of the construction project."[7]

¶34 The majority's "poor fit" rationale rests on its erroneous belief that all TLEs terminate upon project completion. They don't. As the majority notes, the after value is calculated "assuming 'the completion of the public improvement.'"[8] Because the majority erroneously believes that "all TLEs expire upon completion of the public improvement" it erroneously concludes that "to assume completion of the public

---

[6] Id., ¶3 n.3.

[7] Id., ¶11 (quoting Wisconsin DOT Real Estate Program Manual 2.4.6.4 (updated Mar. 2020)).

[8] Id., ¶16 (quoting Wis. Stat. § 32.09(6g)).

9

improvement is to also assume the termination of the TLE. In other words, the 'before' value captures the value of the property before the TLE exists and the 'after' value assumes the TLE has ceased to exist. A before-and-after valuation therefore never captures the actual value of the TLE while it exists."[9] The majority misinterprets the statutory language.

¶35 Wisconsin Stat. § 32.09(6g)'s method of determining damages does not calculate "after" damages based on the expiration of the TLE; rather, "[t]he 'date of evaluation' generally is the date on which the easement is acquired." 118th St. Kenosha, LLC, 359 Wis. 2d 30, ¶37 n.13. Accordingly, "compensation for an easement is calculated by considering the fair market value of the whole property immediately before and after the 'date of evaluation'" which is "the date on which the easement is acquired." Id., ¶37. If the majority applied the actual terms of the TLE instead of hypothetical facts (apparently based on assertions in Wisconsin Department of Transportation (DOT) guidance documents), the before-and-after methodology (properly applied) could easily capture the impact of the TLE on the fair market value of the property. Wisconsin Stat. § 32.09(6g) may require the evaluator to assume completion of the public improvement; however, it does not command the evaluator assume the highway is open to the public.

¶36 What the majority characterizes as "the actual value of the TLE while it exists"[10] may be captured by language of the

---

[9] Id.

[10] Id.

statute the majority does not address anywhere in its opinion[11]: "In determining severance damages under this paragraph, the condemnor may consider damages which may arise during construction of the public improvement, including damages from noise, dirt, temporary interference with vehicular or pedestrian access to the property and limitations on use of the property." Wis. Stat. § 32.09(6)(e). And if those damages do not adequately capture the property owner's actual damages, the statute does not preclude consideration or utilization of other measures of damages because "the compensation to be paid by the condemnor" is "without restriction because of enumeration" under § 32.09(6g).

## II. A THREAT TO PRIVATE PROPERTY

¶37 The majority's "poor fit" rationale is not the majority's only error. As explained in the prior section, the majority misapplies legal terms of art in Wis. Stat. § 32.09(6g). Properly understood, those terms pose no barrier to Backus' argument, as even Waukesha County concedes. More fundamentally, the majority's misunderstanding of fundamental property law principles endangers private property rights. Taking the majority's reasoning to its logical conclusion, there has not even been a taking in this case.

¶38 First, the majority states the word "remainder" ("as contrasted with 'whole property'") means "[t]hat which remains when a part has been taken away, used, or otherwise dealt with;

---

[11] The majority relegates the language to a footnote and never analyzes it. Id., ¶18 n.10.

11

the rest," or "the remaining part or fragment of something."[12] The majority then claims, "a TLE takes land only for temporary use; all portions of the land remain under the property owner's control upon the TLE's termination. . . . Without a continuing division or severance of land, what 'remainder' is there to value?"[13] The majority seems to suggest Waukesha County did not take any property at all, in which case, no compensation is due; however, the majority acknowledges the taking of a TLE is compensable. With such conflicting statements, the majority only compounds the confusion spawned by its opinion. See generally Zinn v. State, 112 Wis. 2d 417, 427-28, 334 N.W.2d 67 (1983) ("[I]t would violate the constitutional mandate of the just compensation clauses of the Wisconsin and United States Constitutions to hold that a temporary taking is not compensable.").

¶39 The majority's error in this regard stems from its failure to consider the temporal component of property. Although the TLE eventually expired, its expiration does not restore the temporal interest taken. A taking occurs whenever "government action directly interferes with or substantially disturbs the owner's use and enjoyment of the property." Bros. v. United States, 594 F.2d 740, 741-42 (9th Cir. 1979) (citation omitted); see also Pumpelly v. Green Bay & Miss. Canal Co., 80 U.S. 166, 179 (1871) ("[T]here are [nu]merous authorities to

---

[12] Id., ¶15 (quoting Remainder, Oxford English Dictionary (edition and year not provided)).

[13] Id.

12

sustain the doctrine that a serious interruption to the common and necessary use of property may be . . . equivalent to the taking of it, and that under the constitutional provisions it is not necessary that the land should be absolutely taken."). Although the government's interference or disturbance of private property may end at some point, it is nonetheless a compensable taking.

¶40  "The right to exclude is 'one of the most treasured' rights of property ownership." Cedar Point Nursery, 141 S. Ct. at 2072 (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435 (1982)).  Even if the government's invasion of Backus' land did not cause permanent or physical damage to his property, the government's invasion is a taking for which Backus must be compensated.  "According to Blackstone, the very idea of property entails 'that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.'"  Id. at 2072 (quoting 2 William Blackstone, Commentaries *2).  "[T]he right to exclude is 'universally held to be a fundamental element of the property right,' and is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'"  Id. (quoting Aetna v. United States, 444 U.S. 164, 176, 179-80 (1979)).

¶41 Backus alleges more than an interference with his right to exclude, however; he also claims the TLE adversely affected the value of the remainder by creating a permanent embankment——in the easement area——with damaged and dying trees

13

on his property. Backus also alleges that trees and other vegetation were removed and not replaced. Nevertheless, the majority asks, "[w]ithout a continuing division or severance of land, what 'remainder' is there to value?"[14] The majority seems to ignore Backus' complaint altogether.

¶42 The majority couples its faulty understanding of "remainder" with its equally faulty conception of "severance damages," a phrase appearing nowhere in Wis. Stat. § 32.09(6g). It asserts "[t]he term 'remainder' . . . is particularly informative as it denotes that the property has been divided or severed in some way."[15] The majority seems to think "severance" means physical division or detachment. The majority is wrong.

¶43 Severance damages do not presuppose the government permanently took a physical parcel of land. Severance damages compensate a property owner whose interest in the land has been taken——severed from the remaining interests in the land, resulting in a loss to the remainder's fair market value. E.g., Narloch v. State Dep't of Transp., Div. of Highways, Div. II, 115 Wis. 2d 419, 422 n.2, 340 N.W.2d 542 (1983) ("Severance damage means the diminution in value of the remaining property resulting from the taking." (citation omitted)); Wis. JI——Civil 8102, at 1 (2008) ("Severance damages reduce the fair market value of the remaining property because of the partial taking."); see also United States v. Miller, 317 U.S. 369, 376 (1943) (explaining that "severance damages" is a "somewhat

---

[14] Id.

[15] Id.

14

loosely" used phrase and defining it to "include <u>any element of value</u> arising out of the relation of the part taken to the entire tract" (emphasis added)); 26 Am. Jur. 2d <u>Eminent Domain</u> § 281 (updated May 2022) ("A landowner may recover as just compensation not only the fair market value of land actually taken but also damages for injuries to the owner's remaining lands, frequently called 'severance damages.' An award may be made for any diminution in the value of the remainder as long as those damages are directly caused by the taking itself."). "In the case of an easement," "[s]everance damages," are calculated by "us[ing] the fair market value of the entire tract immediately before and immediately after the taking." <u>Ala. Elec. Coop., Inc. v. Jones</u>, 574 So. 2d 734, 735 (Ala. 1990) (citation omitted).

¶44 The majority's misconception of severance damages permeates its discussion of Wis. Stat. § 32.09(6). That subsection contains an illustrative list of damages a property owner may seek in addition to the diminution in fair market value. The statute commands "giving effect" to "items of loss or damages to the property" regardless of whether the statute specifies them ("without restriction because of enumeration but without duplication") provided the property owner proves them ("where shown to exist"). Despite this unambiguous language, the majority treats the list as if it were exhaustive, and then proclaims, "those items [in the list] contemplate permanent losses or involve damages from 'actual severance of land,' and

15

thus would compensate for only limited aspects of a TLE."[16] The majority quotes the "actual severance of land" language in the first sentence of § 32.09(6)(e) but conveniently does not address the very next sentence of the statute, which is not only more expansive but expressly encompasses temporary invasions of property: "In determining severance damages under this paragraph, the condemner may consider damages which may arise during construction of the public improvement, including damages from noise, dirt, temporary interferences with vehicular or pedestrian access to property and limitations on use of the property." This statutory language defeats the majority's hyper-literal construction of "actual severance of land." See Brey v. State Farm Mut. Auto. Ins. Co., 2022 WI 7, ¶13, 400 Wis. 2d 417, 970 N.W.2d 1 (rejecting a "hyper-literal approach").

¶45 Contrary to the majority's atextual conclusion that the statute is a "poor fit" for anything but permanent easements, the statutory language expressly grants compensation for "temporary interferences" with access to property, which is precisely (at least in part) the taking for which Backus seeks to be compensated. The majority's failure to address the second sentence——containing the non-exhaustive list of possible damages——shows the lengths to which the majority will go in order to justify its results-oriented decision in this case. Backus is statutorily entitled to present evidence of the damages he sustained as a result of the TLE, and to recover them

---

[16] Id., ¶18 (quoting Wis. Stat. § 32.09(6)(e)).

16

if "shown to exist." Wis. Stat. § 32.09(6g). The majority instead removes this statutory compensation for takings in the form of TLEs.

¶46 If the majority were correct, its logic would seem to foreclose Wis. Stat. § 32.09(6g)'s application not only to TLEs but to many permanent easements as well. Few easements literally "sever" land in a literal and physical sense; nevertheless, the United States Constitution requires just compensation. See, e.g., Cedar Point Nursery, 141 S. Ct. at 2074 (reasoning that "a physical appropriation is a taking whether it is permanent or temporary. . . . [T]he duration of an appropriation . . . bears only on the amount of compensation. . . . [A]fter finding a taking by physical invasion, [this court has] remanded the case to the lower court to determine 'whether the easement taken was temporary or permanent,' in order to fix the compensation due" (citations omitted; quoted source omitted)). Section 32.09 was obviously drafted to comply with the constitutional command to justly compensate property owners whose interests in land are taken by the government, however temporarily. See 260 N. 12th St., LLC v. State of Wis. Dep't of Transp., 2011 WI 103, ¶44, 338 Wis. 2d 34, 808 N.W.2d 372 ("Wisconsin Stat. § 32.09 codifies the constitutional requirement that a property owner receive just compensation for the taking of his or her property. Because § 32.09 is a statute intended to benefit an owner whose property is taken against his or her will, we afford it liberal construction." (citations omitted)). The statute, after all,

17

applies "[i]n all matters involving the determination of just compensation in eminent domain proceedings[.]" § 32.09(intro.). The majority's engrafting of a permanence prerequisite does not comport with the Takings Clause and creates a situation not contemplated by the statute's introduction: a just compensation case in which the statute's rules will not be applied.

¶47 Logically, if Wis. Stat. § 32.09(6g) does not apply to TLEs, they cannot be easements within the meaning of the statute. And if they are not easements under § 32.09(6g), then § 32.09(6) must govern compensation for their taking. Section 32.09(6) applies "[i]n the case of a partial taking of property other than an easement" but the majority does not calculate compensation under its terms, without explaining why. Of course, the calculation in this case would be no different than under § 32.09(6g), so the majority silently deactivates this section of the statute too, ostensibly to avoid a "result" it regards as "unreasonable."

## II. CONCLUSION

¶48 The majority acknowledges, as it must, that "[f]acially, [Wis. Stat.] § 32.09(6g) does not differentiate between a TLE and a permanent easement, and thus both Backus and the County maintain that the statute applies to all easements—temporary and permanent alike."[17] Its entire analysis should have ended there. Instead, the majority adopts an underdeveloped argument raised in an amicus brief submitted by the self-interested DOT, which advocated for a statutory

---

[17] Id., ¶13.

18

construction benefitting the government at the expense of property owners. The result is a bad precedent, to which I dissent.

¶49 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this dissent.