# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2020AP1078-FT |

| | |
|---|---|
| COMPLETE TITLE: | Secura Supreme Insurance Company, |
| | Plaintiff-Appellant-Petitioner, |
| | v. |
| | The Estate of Daniel Keith Huck, |
| | Defendant-Respondent. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 399 Wis. 2d 542, 966 N.W.2d 124
PDC No: 2021 WI App 69 - Published

| | |
|---|---|
| OPINION FILED: | March 22, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 7, 2022 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Racine |
| JUDGE: | Eugene A. Gasiorkiewicz |

JUSTICES:
ROGGENSACK, J., delivered the majority opinion of the Court with respect to ¶¶1-2, 4-16, and 29, in which ZIEGLER, C.J., ANN WALSH BRADLEY, DALLET, HAGEDORN, and KAROFSKY, JJ., joined, and an opinion, in which ZIEGLER, C.J., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.
NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs filed by *Barbara A. O'Brien, Erik M. Gustafson,* and *Borgelt, Powell, Peterson & Frauen, S.C.,* Milwaukee. There was an oral argument by *Patryk Silver.*

For the defendant-respondent, there was a brief filed by *Susan R. Tyndall, Tony M. Dunn, Angela Komp,* and *Habush, Habush*

*& Rottier, S.C.,* Racine. There was an oral argument by *Tony M. Dunn.*

An amicus curiae brief was filed by *Edward E. Robinson* and *Cannon & Dunphy, S.C.,* Brookfield, for the Wisconsin Association for Justice. There was an oral argument by *Edward E. Robinson.*

An amicus curiae brief was filed by *James A. Friedman, Daniel C.W. Narvey,* and *Godfrey & Kahn, S.C.,* Madison, for the Wisconsin Insurance Alliance, the American Property Casualty Insurance Association, and the Wisconsin Defense Counsel.

**2023 WI 21**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2020AP1078-FT
(L.C. No. 2019CV1847)

STATE OF WISCONSIN          :          IN SUPREME COURT

Secura Supreme Insurance Company,

       **Plaintiff-Appellant-Petitioner,**

  v.

**The Estate of Daniel Keith Huck,**

       **Defendant-Respondent.**

**FILED**

**MAR 22, 2023**

Sheila T. Reiff
Clerk of Supreme Court

ROGGENSACK, J., delivered the majority opinion of the Court with respect to ¶¶1-2, 4-16, and 29, in which ZIEGLER, C.J., ANN WALSH BRADLEY, DALLET, HAGEDORN, and KAROFSKY, JJ., joined, and an opinion, in which ZIEGLER, C.J., joined. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY, HAGEDORN, and KAROFSKY, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a dissenting opinion.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 PATIENCE DRAKE ROGGENSACK, J. Petitioner Secura Supreme Insurance Company (Secura), which insured Daniel Keith Huck, seeks review of a published court of appeals decision[1] that

---

[1] Secura Supreme Ins. Co. v. Est. of Huck, 2021 WI App 69, 399 Wis. 2d 542, 966 N.W.2d 124.

affirmed an order granting judgment to the Estate of Daniel Keith Huck (Estate).[2] We affirm the court of appeals.

¶2  We interpret Secura's policy as precluding Secura from reducing its liability to the Estate by the total amount of payments the Estate initially received. The Estate first received worker's compensation from Huck's employer's worker's compensation insurer (WC insurer), and then a settlement from the tortfeasor's insurer. Wisconsin Stat. § 102.29(1)(b)(2021-22)[3] obligated the Estate to reimburse the WC insurer with a portion of the settlement it received from the tortfeasor. Secura's underinsured motorist (UIM) policy contemplated payments made in accordance with worker's compensation law in its reducing clause, and obligated the Estate to reimburse the WC insurer. The policy also required the Estate to exhaust any other bodily injury liability bonds or policies and to receive payment from them before Secura would pay UIM benefits. Accordingly, we conclude the policy's plain language required its payment of UIM benefits based on the Estate's recovery after reimbursements to the WC insurer and collection of the tortfeasor's liability payment had occurred.

¶3  However, Secura argues its policy "substantially incorporates" the statutory language of Wis. Stat. § 632.32(5)(i), which permits it to reduce payment by the amount

---

[2] The Honorable Eugene A. Gasiorkiewicz of Racine County presided.

[3] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

2

the Estate initially received. We conclude the plain language of § 632.32(5)(i) establishes that an insurer may reduce its liability by the recovery of the insured at the time the insurer enforces its reducing clause. The Estate's obligatory reimbursement was made pursuant to "worker's compensation law," which § 632.32(5)(i)2. recognizes. For these reasons, we conclude that Secura is not statutorily authorized to reduce its liability limits by the total worker's compensation and tortfeasor settlement payments the Estate initially received but was obligated to reimburse in part. Accordingly, Secura's policy and § 632.32(5)(i) require Secura to provide an additional $9,718.73 to the Estate.

## I. BACKGROUND

¶4 The facts are undisputed. Mr. Huck was struck and killed by a motorist while he performed his job duties for the Village of Mount Pleasant. Since the fatal accident occurred in the course of Mr. Huck's employment, the Village's WC insurer initially provided $35,798.04 to the Estate.

¶5 The motorist that struck Mr. Huck was insured for $25,000 in liability coverage, which also was provided to Mr. Huck's Estate. However, by receiving the $25,000 settlement from the tortfeasor, the Estate was obligated to reimburse the WC insurer from the settlement based on Wis. Stat. § 102.29(1)(b). As required, the Estate reimbursed the WC insurer $9,718.73 so that the Estate ultimately retained $26,079.31 from worker's compensation. This dispute centers on the importance of the $9,718.73 reimbursement (the "Disputed

Amount") that the Estate was required to return to the WC insurer.

¶6    Mr. Huck had purchased an automobile insurance policy from Secura that included UIM coverage with a liability limit of $250,000 for "each person." The Estate's recovery from worker's compensation and the tortfeasor were insufficient to cover Mr. Huck's damages, which exceeded $250,000. The Estate submitted a claim under the Secura UIM policy. The policy's reducing clause allowed Secura to reduce its UIM liability limits by the amounts paid by a tortfeasor, and by "amounts paid or payable under any worker's compensation law."[4] Therefore, Secura reduced its liability limit to the Estate by the $25,000 settlement with the tortfeasor. Secura also reduced its liability limit by the total worker's compensation benefit of $35,798.04, "even [though] some of that money (the Disputed Amount) return[ed] to the [worker's compensation] Payor." Based on these reductions, Secura tendered $189,201.96 to the Estate.[5]

¶7    Secura filed a declaratory judgment complaint and moved for judgment on the pleadings pursuant to Wis. Stat. § 802.06(3). Secura sought a declaration that its UIM reducing

---

[4] A reducing clause "permits a setoff from the insured's UIM coverage the amount paid to the insured by the underinsured tortfeasor," or by other enumerated sources. Dowhower ex rel. Rosenberg v. W. Bend Mut. Ins. Co., 2000 WI 73, ¶1, 236 Wis. 2d 113, 613 N.W.2d 557.

[5] Secura explained in its declaratory judgment complaint that: ($250,000)-($25,000 tortfeasor settlement)-($35,798.04 in worker's compensation) = $189,201.96.

4

clause applies to the total "amount paid" pursuant to the worker's compensation payment, notwithstanding any reimbursement under Wis. Stat. § 102.29. The circuit court denied Secura's motion and granted the Estate judgment on its counterclaim, ordering Secura to tender the Disputed Amount to the Estate. Secura appealed.

¶8 The court of appeals affirmed, relying on our statutory analysis of Wis. Stat. § 632.32(5)(i) in Teschendorf v. State Farm Ins. Cos., 2006 WI 89, 293 Wis. 2d 123, 717 N.W.2d 258. In Teschendorf, we held that § 632.32(5)(i) "does not allow an insurer to reduce uninsured motorist [UM] policy limits by worker's compensation payments that are not made to or on the behalf of the insured, the insured's heirs, or the insured's estate." Id., ¶2. The court of appeals reviewed our statutory analysis and public policy rationales in Teschendorf before concluding that Secura is "permitted to reduce its [UIM] coverage limits . . . [only] by the total amount of worker's compensation actually received by the Estate." Secura Supreme Ins. Co. v. Est. of Huck, 2021 WI App 69, ¶20, 399 Wis. 2d 542, 966 N.W.2d 124. Accordingly, the court of appeals determined Secura must provide the Estate the Disputed Amount.

¶9 Secura petitioned us for review, which we granted. Secura renews its argument that the plain language of "amounts paid" and "payment" settles this matter. Secura argues it may reduce its liability by the "amounts paid" to the Estate regardless of what happened after those amounts were provided because the Estate was paid those amounts, notwithstanding its

5

obligation to reimburse the WC insurer.[6] The Estate contends the Disputed Amount cannot be considered an "amount paid" because the Estate did not retain possession of it. It argues that Secura impermissibly reduced its UIM liability limits by the Disputed Amount, and that Secura owes it the Disputed Amount for a total recovery of $198,920.69 under the policy.

## II. DISCUSSION

### A. Standard of Review

¶10 Our task is to interpret an insurance policy and Wis. Stat. § 632.32(5)(i) based on undisputed facts. The interpretation of an insurance policy presents a question of law that we review independently. Smith v. Atl. Mut. Ins. Co., 155 Wis. 2d 808, 810, 456 N.W.2d 597 (1990). Statutory interpretation also presents a question of law that we review independently. Mau v. N.D. Ins. Rsrv. Fund, 2001 WI 134, ¶28, 248 Wis. 2d 1031, 637 N.W.2d 45.

### B. Secura's Policy

¶11 We first review the UIM policy Mr. Huck purchased from Secura. The Declarations page provides that Mr. Huck purchased UIM coverage with a liability limit of $250,000 for "each

---

[6] The policy allows Secura to reduce its liability by "all sums: paid" (by or on behalf of persons who are legally responsible) and by "all sums: paid or payable" (worker's compensation law). Wisconsin Stat. § 632.32(5)(i) allows insurers to reduce their liability by "[a]mounts paid" (by or on behalf of persons who are legally responsible) and "[a]mounts paid or payable" (worker's compensation law). Despite the minor differences between the policy language and statute, Secura relies on its interpretation of "paid."

person." The policy includes an "Underinsured Motorist Coverage" endorsement. The UIM endorsement establishes that Secura "will pay under this coverage only after the limits of liability under any bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements." The policy also includes a reducing clause, which provides in pertinent part:

> The limit of liability shall be reduced by all sums:
>
> (1) Paid because of the bodily injury by or on behalf of persons or organizations who may be legally responsible . . . .
>
> (2) Paid or payable because of the bodily injury under any of the following or similar law:
>
> a. Worker['s] compensation law;
>
> . . . .
>
> This coverage, when combined with any amounts paid by liability policies or bonds applicable to the owner or driver of an underinsured motor vehicle, will provide coverage up to the amount stated in the Declarations.

This is the contract language we interpret to determine whether Secura's policy permits the insurer to reduce its UIM liability limit to the Estate by the total payments it initially received, rather than by the Estate's recovery after reimbursement to the WC insurer had occurred.

¶12 We begin by revisiting the rules that guide our analysis. Our interpretation of an insurance policy is controlled by the same rules of construction that we apply to interpret a contract. Kremers-Urb. Co. v. Am. Emps. Ins. Co., 119 Wis. 2d 722, 735, 351 N.W.2d 156 (1984). Our goal is to

7

"give effect to the intent of the parties as expressed in the language of the policy." Folkman v. Quamme, 2003 WI 116, ¶12, 264 Wis. 2d 617, 665 N.W.2d 857. Language in an insurance contract "is to be given the common and ordinary meaning it would have in the mind of a lay person." Kremers-Urb., 119 Wis. 2d at 735. "If possible, a court should interpret a contract so that all parts are given meaning." Whirlpool Corp. v. Ziebert, 197 Wis. 2d 144, 154, 539 N.W.2d 883 (1995). When the "terms of an insurance policy are plain on their face, the policy must not be rewritten by construction." Smith, 155 Wis. 2d at 811.

¶13 The policy does not define the term "paid." Secura argues that "paid" simply means an obligation has been discharged, "no matter the ultimate destination." Secura argues that the WC insurer and the tortfeasor's insurer "paid" the Estate, consequently discharging their obligations. Therefore, Secura argues it may reduce its liability limit by the Disputed Amount despite the Estate's statutory obligation to repay a portion of its recovery to the WC insurer.

¶14 The plain language in the policy's reducing clause allows Secura to reduce its liability by "sums" "[p]aid or payable . . . under any . . . [w]orker['s] compensation law." Accordingly, the policy contemplates payments made consistent with worker's compensation laws (because of bodily injury). See State ex rel. Journal/Sentinel, Inc. v. Pleva, 155 Wis. 2d 704,

8

710, 456 N.W.2d 359 (1990) (express reference to a law by a contract reflects the parties' clear intent to address it).[7]

¶15 Located in Wis. Stat. ch. 120 "Worker's Compensation," Wis. Stat. § 102.29, the statute by which the Estate was obligated to reimburse the WC insurer, is a worker's compensation law. Although the policy does not specifically identify the worker's compensation law to which it refers, there is no dispute that § 102.29 comes within that general provision in the policy. See id. at 712 ("[W]e give full meaning to the intent of the parties, as ascertained from the express language of the contract.").

¶16 Accordingly, Secura may not alter its liability limit based on the outcome of some, and not all, "sums" paid "because of" a payment under worker's compensation law. It follows that the "sums" by which Secura may reduce its liability because of "worker's compensation law" account for the Estate's reimbursement pursuant to the Wis. Stat. § 102.29 requirements. Lastly, because the policy's plain language does not except reimbursements made under ch. 102, we will not read in an exception that is not there. To do so would rewrite the policy, which we cannot do. Smith, 155 Wis. 2d at 811. Since the

---

[7] See also Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, ¶60, 295 Wis. 2d 1, 719 N.W.2d 408 ("[T]he laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as if they were expressly referred to or incorporated in its terms. This principle embraces alike those which affect its validity, construction, discharge, and enforcement." (quoting Von Hoffman v. City of Quincy, 71 U.S. 535, 550 (1866)).

policy contemplates payments made in accordance with worker's compensation law, including § 102.29, Secura may not ignore the law's effects on the Estate's recovery. Accordingly, Secura may not reduce its liability limit by the Disputed Amount.

¶17 Furthermore, even if we were to accept Secura's argument that the word "paid" completely resolved the dispute, we would have to reject its interpretation of the policy's terms because it impermissibly interprets the reducing clause in a manner that renders a portion of the contract meaningless. Md. Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶45, 326 Wis. 2d 300, 786 N.W.2d 15 ("[C]ontract language should be construed to give meaning to every word, 'avoiding constructions which render portions of a contract meaningless, inexplicable or mere surplusage.'" (internal citations omitted)).

¶18 The policy directs, "We will pay under this coverage only after the limits of liability under any bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements." The policy amount that is "paid or payable" under worker's compensation law is a timed payment as the policy directs that Secura "will pay" UIM coverage "only after" other sources of payment "have been exhausted." Because we must give meaning to a policy's provisions by reviewing the policy as a whole, we do not review the reducing clause in isolation. Folkman, 264 Wis. 2d 617, ¶24. Stated otherwise, the policy's plain language conditions Secura's UIM payment on the final resolution of "amounts paid" by other sources;

10

accordingly, we conclude that the policy addresses an insured's recovery after required reimbursements have been made.[8]

C. Wisconsin Stat. §§ 632.32(5)(i) and 102.29

¶19 Secura argues its policy "substantially incorporates" the language of Wis. Stat. § 632.32(5)(i), which it argues "provides" that Secura need not pay the Disputed Amount to the Estate. Accordingly, we turn next to interpret the statute to determine whether it permits Secura to reduce its payment to the Estate as Secura contends.[9] Secura argues that the statute

---

[8] We note Wis. Stat. § 893.43(2) supports our interpretation of the policy. There, the legislature has provided that "A cause of action involving underinsured motorist coverage . . . accrues on the date there is final resolution of the underlying cause of action by the injured party against the tortfeasor." This is important because final resolution of the claim against the tortfeasor is what causes the injured party, under Wis. Stat. § 102.29(2), to reimburse the WC insurer for a portion of its initial payment to the injured workman.

[9] We have interpreted this statute previously, but never in light of the novel issue now facing us: "[w]hether the statutorily approved phrase 'all sums . . . [p]aid or payable because of the bodily injury under [w]orker's compensation law' in an underinsured motorist ('UIM') insurance policy's reducing clause necessarily permits the reduction for all amounts paid, including those amounts that the employer/worker's compensation insurer initially paid, but then recovered through a third-party action pursuant to Wis. Stat. § 102.29." Pet. Br. at 7. See Teschendorf v. State Farm Ins. Cos., 2006 WI 89, 293 Wis. 2d 123, 717 N.W.2d 258 (interpreting Wis. Stat. § 632.32(5)(i) to determine whether an insurance company may reduce its liability by the amount of worker's compensation paid to the State Fund rather than to an estate); Marotz v. Hallman, 2007 WI 89, ¶23, 302 Wis. 2d 428, 734 N.W.2d 411 (interpreting whether payments to an insured from non-UIM tortfeasors are ones "that apply" under § 632.32(5)(i)); Dowhower, 236 Wis. 2d 113, ¶2 (interpreting whether § 632.32(5)(i) violates substantive due process). See also Landis v. Physicians Ins. Co. of Wis., Inc., 2001 WI 86, ¶15, 245 Wis. 2d 1, 628 N.W.2d 893 ("Depending on

allows an insurer to reduce its liability by "amounts paid" by worker's compensation and the tortfeasor, and therefore it is "not relevant" that the Estate had to repay a portion of the worker's compensation recovery.

¶20 Wisconsin Stat. § 632.32(5)(i) states in relevant part:

> (i) A policy may provide that the limits under the policy for . . . underinsured motorist coverage for bodily injury or death resulting from any one accident shall be reduced by any of the following that apply:
>
> 1. Amounts paid by or on behalf of any person or organization that may be legally responsible for the bodily injury or death for which the payment is made.
>
> 2. Amounts paid or payable under any worker's compensation law.

¶21 We first review the principles of statutory interpretation, as set forth in Kalal. State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110. We "assume that the legislature's intent is expressed in the statutory language." Id., ¶44. Accordingly, we begin with the language of the statute, and "[i]f the meaning of the statute is plain, we ordinarily stop the inquiry." Id., ¶45. "A dictionary may be utilized to guide the common, ordinary meaning of words." Noffke ex rel. Swenson v. Bakke, 2009 WI 10, ¶10, 315 Wis. 2d 350, 760 N.W.2d 156. We also strive to give "reasonable effect to every word, in order to avoid surplusage."

the facts of a case, the same statute may be ambiguous in one setting and unambiguous in another.").

Kalal, 271 Wis. 2d 633, ¶46. We note that "[s]tatutory interpretation centers on the 'ascertainment of meaning,' not the recitation of words in isolation." Brey v. State Farm Mut. Auto. Ins. Co., 2022 WI 7, ¶13, 400 Wis. 2d 417, 970 N.W.2d 1 (quoting Kalal, 271 Wis. 2d 633, ¶47).

¶22 With these principles in mind, we conclude that the plain language of the statute grants permission to an insurer to reduce its liability limit when the final amount of an insured's worker's compensation recovery has been determined. The parties agree that Wis. Stat. § 632.32(5)(i) serves as legislative permission to insurers to reduce their limit of liability by enumerated means. Subdivisions (i)1. and (i)2. are at issue in the instant case.

¶23 Both subdivisions contain the phrase "amounts paid," so we begin there. In this context, "paid" is a past participle of pay that the legislature uses to modify "amounts." Secura argues the word, "paid," simply communicates past action, but it overlooks that past participles are "routinely used as adjectives to describe the present state of a thing." Henson v. Santander Consumer USA Inc., 582 U.S. 79, 84 (2017) (interpreting the Fair Debt Collection Practices Act). For example, the Supreme Court explained in its statutory interpretation of "a debt owed" that an ordinary person would understand "collect[ing] a debt owed to Steve," as "a debt currently owed to Steve," rather than "a debt Steve used to own" and now does not. Id. (emphases in original).

13

¶24 Similarly, "amounts paid" uses the past participle of "pay" as an adjective to describe a present state. An ordinary person would understand "amount paid" to mean "amount currently paid" rather than "amount once paid and then given back." See id.

¶25 To ensure our interpretation gives meaning to all words in the statute, we next interpret the word, "payable," that appears only in Wis. Stat. § 632.32(5)(i)2. Kalal, 271 Wis. 2d 633, ¶46. "Payable" is defined as "requiring to be paid, specifying payment to a particular payee at a specified time or occasion, or in a specified manner." Webster's Third New Int'l Dictionary 1659 (1986). The plain meaning of "payable," therefore, is that payment is due, but the manner and the timing of payment may involve future payments. For instance, a settlement may be "payable in installments," or "payable monthly." Regardless, it would still be an "amount payable" under our interpretation of the statute.

¶26 Lastly, Wis. Stat. § 632.32(5)(i)2. allows for the reduction of "[a]mounts paid or payable under any worker's compensation law." As we stated earlier, Wis. Stat. § 102.29 is a worker's compensation law that establishes reimbursement of amounts initially received as worker's compensation due to subsequent settlements. By including "worker's compensation law" in § 632.32(5)(i)2., the legislature contemplated proceedings such as those subject to § 102.29. See Union Cemetery v. City of Milwaukee, 13 Wis. 2d 64, 68-69, 108 N.W.2d 180 (1961) ("A general reference refers generally to the law on

14

a subject and incorporates the entire subject matter."). Because § 102.29 obligated the Estate to reimburse the Disputed Amount, the reimbursement was made pursuant to a worker's compensation law. We interpret § 632.32(5)(i)2. to account for the reimbursement into the "amount paid" to the Estate so that the statute contemplates the Estate's final recovery.

¶27 Accordingly, we conclude, that "amounts paid" under Wis. Stat. § 632.32(5)(i)1. and "amounts paid or payable" in subd. 2., both reference the present tense. "Amounts paid" is interpreted as the current "amounts paid" or outstanding such as by an installment agreement,[10] at the time an insurer seeks to reduce its liability under § 632.32(5)(i). Stated otherwise, "amounts paid" refers to an insured's final recovery at the time an insurer reduces its liability, which we recognize may occur when a UIM claim accrues.[11] See Wis. Stat. § 893.43(2).

¶28 At the time Secura sought to reduce its liability, the Estate had already reimbursed the Disputed Amount pursuant to a worker's compensation law. The final "amounts paid" to the Estate pursuant to Wis. Stat. § 632.32(5)(i) was $51,079.31 from the combined tortfeasor and worker's compensation settlements.

---

[10] We provide just one example of a situation that gives meaning to the term "payable." Our decision today does not limit "payable" to just installment payments or other circumstances that have not been briefed before us.

[11] Our conclusion is consistent with that reached in other jurisdictions. See Wildman v. Nat'l Fire & Marine Ins. Co., 703 N.E.2d 683, 687 (Ind. App. 1998); Cherry v. Coregis Ins. Co., 204 P.3d 522, 525-26 (Idaho 2009).

15

Secura seeks to reduce its UIM liability to the Estate by both the "amounts paid" and also by the Disputed Amount; in other words, Secura seeks to reduce its liability by the amount the Estate initially received before required reimbursements were made. Section 632.32(5)(i) does not support this. Secura must tender the Disputed Amount to the Estate in accordance with the statute.

### III. CONCLUSION

¶29 We interpret Secura's policy as precluding Secura from reducing its liability to the Estate by the total amount of payments the Estate initially received. The Estate first received worker's compensation from Huck's employer's WC insurer, and then a settlement from the tortfeasor's insurer. Wisconsin Stat. § 102.29(1)(b)2. obligated the Estate to reimburse the WC insurer with a portion of the settlement it received from the tortfeasor. Secura's UIM policy contemplated payments made in accordance with worker's compensation law in its reducing clause, and obligated the Estate to reimburse the WC insurer. The policy also required the Estate to exhaust any other bodily injury liability bonds or policies and to receive payment from them before Secura would pay UIM benefits. We therefore conclude that the policy's plain language required its payment of UIM benefits based on the Estate's recovery after reimbursements to the WC insurer and collection of the tortfeasor's liability payment had occurred.

¶30 However, Secura argues its policy "substantially incorporates" the statutory language of Wis. Stat.

16

§ 632.32(5)(i), which permits it to reduce payment by the amount the Estate initially received. We conclude the plain language of § 632.32(5)(i) establishes that an insurer may reduce its liability by the recovery of the insured at the time the insurer enforces its reducing clause. The Estate's obligatory reimbursement was made pursuant to a "worker's compensation law," which § 632.32(5)(i)2. recognizes. For these reasons, we conclude that Secura is not statutorily authorized to reduce its liability limits by the gross worker's compensation and tortfeasor settlement payments the Estate initially received but was obligated to reimburse in part. Accordingly, Secura's policy and § 632.32(5)(i) require Secura to provide an additional $9,718.73 to the Estate.

*By the Court.*—The decision of the court of appeals is affirmed.

¶31 REBECCA FRANK DALLET, J. *(concurring).* If I buy an $8 sandwich, hand the cashier a $10 bill, and she hands me my sandwich and $2 in change, how much was she "paid" for the sandwich? Eight dollars, of course. But according to Secura, that isn't so clear. It contends that the Estate of Daniel Huck was "paid" $250,000 in connection with the accident that caused Huck's death, even though the Estate ended up with just $240,281.27 after it was required by statute to pay the $9,718.73 difference back to a workers' compensation insurer. See generally Wis. Stat. § 102.29(1). By that same logic, the cashier in my sandwich example was paid $10, even though she kept only $8. I agree with the majority/lead opinion that this nonsensical result is contrary to the plain meaning of the word "paid" and, therefore, the policy's language. I write separately, however, because I reach that conclusion for different——and in my view, simpler——reasons.

¶32 The language of Secura's policy is clear. It guaranteed the Estate a "predetermined, fixed level of [underinsured motorist coverage]," $250,000, "that is arrived at by combining payments from all sources." Welin v. Am. Fam. Mut. Ins. Co., 2006 WI 81, ¶49, 292 Wis. 2d 73, 717 N.W.2d 690. The initial grant of coverage states that Secura will pay damages the Estate "is legally entitled to recover from the owner or operator of an underinsured motor vehicle because of bodily injury." The emphasized terms are defined in the policy, and one of them——"underinsured motor vehicle"——is relevant here. An underinsured motor vehicle is one "to which a bodily

1

injury . . . policy applies at the time of the accident but its limit for bodily injury liability is . . . [l]ess than the limit of liability for this [underinsured motor vehicle] coverage." The limit of liability for Secura's coverage is $250,000, which Secura "will pay . . . only after the limits of liability under any bodily injury liability . . . policies have been exhausted by payments of judgments or settlements." In other words, Secura promised to pay last, after the Estate recovered any money it was owed for the accident by the tortfeasor or others, and only if the limits of the tortfeasor's insurance coverage were less than $250,000. And all Secura promised to pay was the difference between the money the Estate recovered from those other sources and $250,000. That is spelled out clearly in the policy's reducing clause, which decreases Secura's limit of liability by "all sums" paid by those legally responsible for the accident or "[p]aid or payable because of the <u>bodily injury</u> under . . . [w]orkers' compensation law."

¶33 The upshot of these provisions is simple. Every dollar the Estate is paid either by those legally responsible for the accident or by workers' compensation reduces Secura's $250,000 limit of liability by that same amount. If the Estate is paid $250,000 or more by those legally responsible or by workers' compensation, then Secura owes nothing. If not, Secura makes up the difference up to $250,000. In any case, the Estate is guaranteed to end up with at least the predetermined, fixed amount of coverage it bargained for, $250,000. See <u>Welin</u>, 282

2

Wis. 2d 73, ¶49. Or at least that's what the policy says should happen.

¶34 Secura argues, however, based on a hyper-literal interpretation of the word "paid," that the Estate should receive just $240,281.27. That is because the Estate initially received $35,798.04 in workers' compensation payments, even though it later had to pay $9,718.73 back to the workers' compensation insurer according to a statutory formula. See Wis. Stat. § 102.29(1), (giving the workers' compensation insurer a right to a portion of the proceeds the Estate recovered from the tortfeasor). In Secura's view, the Estate was therefore "paid" the full $35,798.04, even though it netted only $26,079.31 in the end.

¶35 The problem with Secura's interpretation is that when the policy is read as a whole, the Estate is only "paid" the money it retains after resolving both its claims against the tortfeasor and any resulting obligations to the workers' compensation insurer. See Liebovich v. Minn. Ins. Co., 2008 WI 75, ¶27, 310 Wis. 2d 751, 751 N.W.2d 764 (explaining that we must read insurance policies "as a whole"). Simply put, it is not enough if, at one point in time or another, the Estate had $250,000. Rather, the policy requires that the Estate end up with the predetermined, fixed, final recovery of at least $250,000 it bargained for. And because Secura's argument would leave the Estate with less than that amount, it must be rejected.

¶36 This conclusion is confirmed both by the policy's language regarding workers' compensation recoveries and by a statute governing underinsured motorist claims. First, the policy's reducing clause lowers Secura's limits of liability by "all sums . . . [p]aid or payable . . . under . . . [w]orkers' compensation law." And as mentioned previously, § 102.29(1)——a provision of workers' compensation law——mandates that the workers' compensation insurer receive a portion of the money the Estate recovered from the tortfeasor. Thus, the amount "[p]aid or payable" under workers' compensation must be determined by taking into account money the Estate had to pay back to the workers' compensation insurer under § 102.29(1). Only after that repayment is made can we know "all sums" the Estate was "[p]aid." See also majority/lead op., ¶16 (reaching a similar conclusion). Second, Wis. Stat. § 893.43(2) states that an underinsured motorist claim accrues for statute-of-limitations purposes only after the "final resolution of the underlying cause of action by the injured party against the tortfeasor." The final resolution of the underlying cause of action against the tortfeasor is also what triggers the injured party's obligation under § 102.29(1) to repay a portion of that final recovery against the tortfeasor to the workers' compensation insurer. For that reason, it makes no sense to calculate the amounts "paid" to the Estate under Secura's policy before that point in time, as Secura does. We only know what the Estate was "paid," and therefore what Secura owes, once the Estate has resolved its claim against the tortfeasor and made any necessary

4

reimbursement to the workers' compensation insurer under § 102.29(1).

¶37 In my view, that's all we need to say to resolve this case. Despite that, the majority/lead opinion goes further, unnecessarily analyzing a provision of the policy that the parties did not meaningfully discuss in their briefs, see majority/lead op., ¶¶17-18, and the omnibus statute, Wis. Stat. § 632.32(5)(i), which regulates reducing clauses. See id., ¶¶19-28. Even though I agree with the majority/lead opinion's bottom line, I would not reach these issues. Accordingly, I respectfully concur.[1]

¶38 I am authorized to state that Justices ANN WALSH BRADLEY, BRIAN HAGEDORN, and JILL J. KAROFSKY join this opinion.

---

[1] I join ¶¶1-2, 4-16, and 29 of the majority/lead opinion.

¶39 REBECCA GRASSL BRADLEY, J.   *(dissenting).*

> I remember once I was with [Justice Oliver Wendell
> Holmes, Jr.]; it was Saturday when the Court was to
> confer.  It was before we had a motor car, and we
> jogged along in an old coupé.  When we got down to the
> Capitol, I wanted to provoke a response, so as he
> walked off, I said to him:  "Well, sir, goodbye.  Do
> justice!"  He turned quite sharply and he said:  "Come
> here. Come here."  I answered: "Oh, I know, I know."
> He replied:  "That is not my job.  My job is to play
> the game according to the rules."

Learned Hand, <u>A Personal Confession</u>, in <u>The Spirit of Liberty</u> 302, 306-07 (Irving Dillard ed., 3d ed. 1960).

¶40  This court should resolve this case by considering the parties' arguments and neutrally applying well-established rules for interpretating insurance policies.  Instead, the majority rejects the parties' contractual agreement in favor of doing justice in a case involving tragic facts.  While the results achieved by the majority's decision may be more palatable, the resulting injury to the rule of law is anything but just.

¶41 Daniel Keith Huck died from a bodily injury he sustained while working for the Village of Mt. Pleasant.  The Estate of Huck received about $36,000 in worker's compensation benefits.  Later, the Estate became statutorily required to reimburse a portion of this payout.  Huck had an insurance policy with underinsured motorist (UIM) coverage through Secura Supreme Insurance Company.  The Estate filed a claim.  Secura and the Estate dispute the amount owed under the policy.  Secura relies on the policy's reducing clause, which provides that the policy's limits "shall be reduced by all sums . . . [p]aid . . . because of the <u>bodily injury</u> under . . . [w]orkers'

compensation law[.]" Secura argues the Estate was "paid" $36,000 because Mt. Pleasant's $36,000 financial obligation to the Estate was discharged when the Estate was provided with the money. The Estate does not respond by referencing definitions of "paid" or relying on grammatical principles. Instead, the Estate primarily argues that siding with Secura would produce an "absurd result." That argument is grounded not in law but in subjective perceptions of justice.

¶42 The majority/lead opinion sides with the Estate, but conspicuously absent from the opinion is any discussion of the Estate's principal argument.[1] Instead, the opinion attempts to develop a textual analysis that was——at best——underdeveloped by the Estate. This court need not address an underdeveloped argument, and it should not do so in this case. See, e.g., Papa v. Wis. Dep't of Health Servs., 2020 WI 66, ¶42 n.15, 393 Wis. 2d 1, 946 N.W.2d 17 (declining to address an underdeveloped argument). Although suffering from its own analytical flaws, Justice Rebecca Frank Dallet's concurrence correctly notes the majority/lead opinion goes too far by "analyzing a provision of the policy that the parties did not meaningfully discuss in their briefs[.]" Concurrence, ¶37. While this court has near-absolute discretion to deviate from the parties' arguments and often does given its law-development function, the majority/lead

_____

[1] This court's internal operating procedures explain, "[i]f . . . the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the 'lead opinion[.]'" Wis. Sup. Ct. IOP III.G.4 (Feb. 28, 2023).

2

opinion does not exercise discretion because it does not explain its departure from the party presentation principle. See Town of Wilson v. City of Sheboygan, 2020 WI 16, ¶73, 390 Wis. 2d 266, 938 N.W.2d 493 (Rebecca Grassl Bradley, J., concurring). The majority/lead opinion does not even acknowledge——let alone explain——why it leaves the Estate's primary argument unaddressed.

¶43 In this case, a persuasive explanation would be difficult to provide. This court granted the petition for review to address the Estate's primary argument, which the court of appeals, in a published opinion, held it was compelled by this court's precedent to adopt. See Secura Supreme Ins. v. Estate of Huck, 2021 WI App 69, ¶7, 399 Wis. 2d 542, 966 N.W.2d 124. Specifically, the court of appeals held it was bound by Teschendorf v. State Farm Insurance Cos., 2006 WI 89, 293 Wis. 2d 123, 717 N.W.2d 258, in which this court disregarded the plain meaning of the law in favor of what the court deemed a more just result. While a majority of the court could not coalesce on a rationale, six justices agreed that a "literal" reading of the law favored the insurer and accordingly deemed it either absurd or ambiguous in order to decide the case in favor of a sympathetic plaintiff. Id., ¶¶18, 22, 32 (majority/lead op.). Notably, in this case court of appeals judge Shelley A. Grogan wrote a concurrence signaling concern that Teschendorf required the court of appeals to disregard the plain language of the insurance policy and Wis. Stat. § 632.32(5)(i)2. (2019–20).[2]

---

[2] Unless otherwise noted, all subsequent references to the Wisconsin Statutes are to the 2019–20 version.

See <u>Secura Supreme Ins.</u>, 399 Wis. 2d 542, ¶21 (Grogan, J., concurring). As the majority/lead opinion notes, this court granted review of the court of appeals decision, but the majority leaves that decision largely unreviewed in its opinions. Majority/lead op., ¶¶1, 9.

¶44 Justice Dallet's concurrence, with its references to allegedly "nonsensical" results, aligns more closely with the Estate's actual argument, but her concurrence is problematic for a different reason. <u>See</u> Concurrence, ¶¶31, 36. Justice Dallet endorses a case-deciding approach grounded in subjective perceptions of justice at the expense of the rule of law.

¶45 Applying the law to the parties' arguments, I conclude the policy's limits should be reduced by the total amount of worker's compensation paid, not by the amount ultimately netted by the Estate. I further conclude Wis. Stat. § 632.32(5)(i)2., which also uses the word "paid," permits such a reduction. I respectfully dissent.

## I. BACKGROUND

### A. The Tragic Facts

¶46 The parties have stipulated to the tragic facts of this case. Huck was struck by a negligently driven motor vehicle while employed as a utility worker for Mt. Pleasant. Huck died as a result. The Estate received about $36,000 in worker's compensation benefits. After that, the Estate settled with the negligent driver's insurance company for the policy limits of $25,000. Additionally, Wis. Stat. § 102.49(5) required Mt. Pleasant to pay $20,000 to the state treasury for

4

the benefit of the Work Injury Supplemental Benefits Fund. Under § 102.29, the Estate was obligated to reimburse about $10,000 of the worker's compensation benefits to the worker's compensation carrier using the settlement proceeds. Accordingly, the Estate received $36,000 in worker's compensation benefits, but the Estate netted only about $26,000. Huck's insurance policy with Secura provided UIM coverage with limits of $250,000; the damages exceed those limits. The Estate made a claim under the policy.

### B. The Reducing Clause

¶47 The parties calculate the amount Secura owes differently, based on different readings of the reducing clause, which provides:

> **B. Reducing Clause:** The limit of liability shall be reduced by all sums:
>
> 1. Paid because of <u>bodily injury</u> by or on behalf of persons or organizations who may be legally responsible. . . .
>
> 2. Paid or payable because of the <u>bodily injury</u> under any of the following or similar laws:
>
> a. Workers' compensation law[.]

The parties dispute only the amount of reduction for worker's compensation benefits. Secura argues for a $36,000 reduction——the amount the Estate received under worker's compensation law——while the Estate argues the reduction should be only $26,000 because the Estate had to reimburse the worker's compensation carrier approximately $10,000. The parties agree the $25,000

settlement reduces the limits.[3]  They also agree the $20,000 payment by Mt. Pleasant to the Fund does not trigger the reducing clause.  Accordingly, the parties calculate the amount owed under the policy as follows:

| **Secura** | **The Estate** |
|---|---|
| $250,000 (the limit of liability) | $250,000 (the limit of liability) |
| −$36,000 (the amount of worker's compensation <u>received</u>) | −$26,000 (the amount of worker's compensation <u>netted</u>) |
| −$25,000 (from the settlement) | −$25,000 (from the settlement) |
| = $189,000 | = $199,000 |

¶48 Notably, the language of the reducing clause is materially similar to the language of Wis. Stat. § 632.32, also known as the "Omnibus Statute" because, as this court has explained, "it sets the minimum requirements all motor vehicle insurance policies in Wisconsin must satisfy."  <u>Brey v. State Farm Mut. Auto. Ins.</u>, 2022 WI 7, ¶5, 400 Wis. 2d 417, 970 N.W.2d 1.  Subsection (5)(i)2. provides:

> (i) A policy may provide that the limits under the policy for uninsured motorist coverage or underinsured motorist coverage for bodily injury or death resulting from any one accident shall be reduced by any of the following that apply:
>
>    . . . .

---

[3] The Estate notes the parties agree that "[t]he UIM reducing clause permitted reduction of the $250,000 UIM limits by the $25,000 recovered from the tortfeasor and the $26,079.31 net benefits paid by the worker's compensation carrier."  The parties "part[] ways" over the $10,000 of worker's compensation benefits that was "repaid[.]"

6

   2. Amounts paid or payable under any worker's compensation law.

The operative effect of the reducing clause must be permissible under § 632.32(5)(i)2.

### C. The Procedural History

¶49 This case's procedural history demonstrates the parties focused on the applicability of Teschendorf. Secura sought from the circuit court a declaration stating it owed only $189,000, and the Estate counterclaimed. The circuit court sided with the Estate.

¶50 Secura appealed, and the Estate's argument in response focused mainly on this court's decision in Teschendorf. It framed the sole issue on appeal as follows:

> In Teschendorf v. State Farm Ins. Companies, 2006 WI 89, 293 Wis. 2d 123, 717 N.W.2d 258, a statutorily-permitted reducing clause was declared impermissible when used to reduce underinsured motorists . . . limits by sums paid not to the insured, but to a state fund . . . . Does a reducing clause permitted by Wis. Stat. § 632.32(5)(i), reducing UIM limits by "all sums . . . [p]aid or payable because of the bodily injury under . . . [w]orker's compensation law," become impermissible where the worker's compensation insurer has been reimbursed pursuant to Wis. Stat. § 102.29, precluding double recovery by the insured?[4]

**Answered by the Circuit Court: Yes.**

(Third and fourth ellipsis and modifications in the original.)

¶51 The court of appeals affirmed the circuit court's decision in a published opinion. Secura Supreme Ins., 399 Wis. 2d 542 (majority op.). The court of appeals accepted the

---

[4] Although this issue statement claims Teschendorf was about UIM coverage, the case was actually about uninsured motorist coverage. See infra Section III.B.

7

Estate's framing, concluding, "[t]he court in Teschendorf squarely rejected the literal reading of the reducing clause Secura proposes here." Id., ¶10 (citing Teschendorf, 293 Wis. 2d 542, ¶¶22, 24, 44). The majority opinion of the court of appeals cites Teschendorf more than 30 times, demonstrating its centrality in the reasoning of the court below. In concurrence, Judge Grogan wrote, "[o]n a clean slate, Secura's textual argument may not have been so swiftly dismissed, but our supreme court foreclosed it in Teschendorf." Id., ¶21 (Grogan, J., concurring).

¶52 Secura filed a petition for review. It explicitly argued "Teschendorf is ripe for reexamination to—at least—clarify the proper analysis [to] the lower courts[.]" In response, the Estate professed this case does not present a novel question of law given Teschendorf. The Estate framed the issue in much the same way that it had framed the issue before the court of appeals:

> Words in statutes and insurance policies are given a meaning which avoids absurd or unreasonable results, or results clearly at odds with the legislature's purpose. . . . Can an insurer reduce its [UIM] coverage limits by sums neither its insured nor his workers compensation insurer recovered because its policy contains a reducing clause deducting "all sums . . . [p]aid or payable because of the bodily injury under . . . [w]orker's compensation law"?

(Second and third ellipsis and second and third modifications in the original.) The Estate argued Teschendorf should not be reexamined because the absurd results canon has been "repeatedly applied" in various contexts—not just in Teschendorf. It claimed this case would be a mere "rehash[ing]" of the "same

8

principles" applied in Teschendorf and several other cases. This court granted Secura's petition.

### D. The Parties' Briefing

¶53 The focus on Teschendorf continued in the briefing. Secura argues the case does not need to be overruled but should be limited to its extreme facts (discussed more in Part III). The Estate argues the court of appeals was correct to "center" its analysis on Teschendorf, declaring the analysis "spot on." Similarly, the Estate claims this case does not raise an issue of "first impression" because, in its view, "the issue raised is very similar to that addressed in Teschendorf[.]" The Estate continues, "Teschendorf . . . require[s] that the appellate court's decision be affirmed." The Estate opens its brief by noting, "Wisconsin courts reject interpretations of statutes that produce results contrary to the statute's purpose and common sense." (Citation omitted.) The Estate also makes passing reference to the principle that statutes should be construed in harmony, grounding this argument in consequentialism. The Estate argues, "[a]s the court of appeals correctly explained, Secura's argument——that the workers compensation was 'paid' to the insured but ignoring that that sum had been reimbursed to the workers compensation insurer—— 'defies common sense and the fundamental purpose of [UIM] insurance coverage[.]'" Quoting Secura Supreme Ins., 399 Wis. 2d 542, ¶17 (majority op.). Claiming a purported ambiguity in the policy, the Estate argues this court must affirm the decision of the court of appeals because "[t]o hold otherwise

9

would create an absurd result[.]" Regardless of how the Estate frames its arguments, every contention advanced by the Estate rests on the absurd results canon.

¶54 In contrast, Secura offers a fully-developed plain language argument in response to the Estate's emphasis on the purported absurdity of the results Secura's plain language interpretation may yield. Secura references dictionary definitions to support its interpretation of "paid," some of which have been adopted by Wisconsin courts in other contexts. See, e.g., Danbeck v. Am. Fam. Mut. Ins., 2000 WI App 26, ¶9, 232 Wis. 2d 417, 605 N.W.2d 925 (noting "payment" is defined as **"1:** the act of paying or giving compensation : the discharge of a debt or an obligation . . . **2:** something that is paid : something given to discharge a debt or obligation or to fulfill a promise" (quoting Payment, Webster's Third New International Dictionary (1993)) (ellipsis in the original)).

¶55 In contrast, the Estate references dictionary definitions once——for the word "reimburse"——which appears nowhere in the relevant language of the policy or the Omnibus Statute.[5] Apparently, the Estate means to suggest that money reimbursed has not been "paid," but even the language the Estate uses to describe the facts of this case presupposes the Estate was, in fact, paid. For example, the Estate writes, "[t]he parties parted ways . . . as to Secura's denial of the [E]state's claim to the extent of the . . . [disputed amount]

_____

[5] The brief also contains a reference to Black's Law Dictionary, within a block quote of another source, but the definition is for the word "insurance."

10

repaid to the workers compensation carrier."  (Emphasis added.)
An amount can be "repaid" only if it in fact has been "paid."

¶56 In attempting to illustrate the meaning of this utterly plain word, Justice Dallet's sandwich shop analogy suffers from a basic mathematical error.  She begins her concurrence with the following scenario:  "If I buy an $8 sandwich, hand the cashier a $10 bill, and she hands me my sandwich and $2 in change, how much was she 'paid' for the sandwich?  Eight dollars, of course.  But according to Secura, this isn't so clear."  Concurrence, ¶31.  This simple analogy fails because Justice Dallet did not incur a $10 financial obligation——only an $8 one.  The moment she handed $10 to the cashier, she satisfied her obligation to pay for the sandwich, but the cashier immediately incurred an obligation to give back $2.  In this case, the worker's compensation carrier incurred a $36,000 financial obligation, which was satisfied when that amount was paid to the Estate.  Had the carrier incurred a mere $26,000 obligation but inadvertently sent the Estate a check for $36,000, perhaps Justice Dallet's analogy would be relevant.  In this case, however, the carrier used exact change.  Even though the law later compelled a reimbursement, had the carrier paid only $26,000 initially, it would not have fulfilled its obligation.  Perhaps textual arguments may exist for a definition of "paid" favoring the Estate, but Justice Dallet offers none.

## II. STANDARD OF REVIEW

¶57 This case requires this court to interpret an insurance policy. The interpretation of a policy is a question of law, subject to independent review. Talley v. Mustafa Mustafa, 2018 WI 47, ¶13, 381 Wis. 2d 393, 911 N.W.2d 55 (citing Water Well Sols. Serv. Grp., Inc. v. Consol. Ins., 2016 WI 54, ¶12, 369 Wis. 2d 607, 881 N.W.2d 285).

¶58 Contrary to the majority, the policy language compels a reduction by the total amount of worker's compensation paid to the Estate. Accordingly, I must determine whether Wis. Stat. § 632.32(5)(i)2. permits such a reduction. Statutory interpretation, like policy interpretation, presents a question of law subject to this court's independent review. Water Well Sols. Serv. Grp., Inc., 369 Wis. 2d 607, ¶12 (citing Estate of Sustache v. Am. Family Mut. Ins., 2008 WI 87, ¶18, 311 Wis. 2d 548, 751 N.W.2d 845).

## III. ANALYSIS

### A. The Consequence of the Majority/Lead Opinion not Reviewing the Court of Appeals Decision

¶59 The majority/lead opinion correctly notes this court granted review of a court of appeals decision; however, it does not review it. In a published opinion, the court of appeals decided it was bound by Teschendorf. By affirming the court of appeals without reviewing its decision, the majority preserves the court of appeals opinion as binding precedent. Although the majority affirms the decision on a different basis, it does not expressly——or even impliedly——signal that the opinion below does not retain its precedential value. Consequently, the court of

12

appeals will understand itself to be bound by that opinion. See State v. Schmidt, 2016 WI App 45, ¶48 n.11, 370 Wis. 2d 139, 884 N.W.2d 510 (citing Blum v. 1st Auto & Cas. Ins., 2010 WI 78, ¶44, 326 Wis. 2d 729, 786 N.W.2d 78). See generally Wis. Mfrs. & Com. v. Evers, 2023 WI 5, ¶2, 405 Wis. 2d 478, 984 N.W.2d 402 (per curiam) (noting that while this court has not addressed the issue directly, when this court affirms a published opinion of the court of appeals, on different grounds but without suggesting its rationale was incorrect, the court of appeals opinion remains binding precedent). At a minimum, the majority should withdraw the precedential status of the opinion below.

### B. This Court's Decision in Teschendorf

¶60 If the majority had reviewed the decision of the court of appeals, it would need to revisit Teschendorf, on which the Estate's argument continues to heavily rely. Although no less tragic, the facts of Teschendorf are quite different than the facts of this case. A man died while acting in the scope of his employment after an uninsured motor vehicle struck a car in which the man was riding. 293 Wis. 2d 123, ¶3 (majority op.). In accordance with Wis. Stat. § 102.49(5)(b) (2001–02), a portion of worker's compensation benefits were paid to the Fund, but none were paid to the man's estate because he was single and had no dependents. Id. Of the approximately $174,000 paid in worker's compensation benefits, $159,000 went to the Fund, and the rest went to recipients other than the man's estate. Id. The man had a policy providing uninsured motorist coverage, with limits of $150,000. Id., ¶4. The insurer argued the reducing

13

clause operated to change the limits to $0 because more than $150,000 had been paid in worker's compensation benefits. Id., ¶5.

¶61 The issue in Teschendorf was whether Wis. Stat. § 632.32(5)(i)2. (2001-02) prohibited reducing the limits by the $159,000 paid to the Fund. Although this court resolved the issue, it was divided on the rationale. Public policy pervaded each member's reasoning.

¶62 This court held Wis. Stat. § 632.32(5)(i)2. prohibited the reduction; however, it was split into two factions. The first faction, which has been subsequently called the "absurdity faction," consisted of three justices who concluded the statutory language unambiguously did not prohibit the reduction but determined the result of applying the unambiguous language would be absurd. Id., ¶18 & n.8. They first recognized the plain meaning of the reducing clause:

> There is no ambiguity in Wis. Stat. § 632.32(5)(i)2. The statute says that policy limits may be reduced by "amounts paid or payable under any worker's compensation law." The clause "amounts paid or payable" is not qualified and unambiguously brings within its scope payments made to the insured or to any other person or entity, provided that the payment was made under any worker's compensation law.

Id., ¶30 (lead op.); see also id., ¶18 n.8 (majority op.) (explaining the absurdity faction "believe[d] that the meaning of the statute is plain, but the results produced by the plain meaning are absurd"). These justices declined to apply the plain meaning, however, because in their view "the results that follow are so unreasonable . . . that they require the plain

14

meaning to be rejected." Id., ¶18 (majority op.). Accordingly, these justices "construe[d] the statute to avoid that result." Id., ¶32 (lead op.) (citing State v. Delaney, 2003 WI 9, ¶15, 259 Wis. 2d 77, 658 N.W.2d 416). Defying a fundamental canon of construction, they opted to read the words "to the insured" into the statute after the words "amounts paid or payable[.]" Id., ¶31. These justices expressly acknowledged the qualifier "to the insured" "is not present in the text of the statute" and its plain meaning "allows policy limits to be reduced regardless of to whom worker's compensation benefits are made." Id. Nevertheless, to protect "injured persons," they opted to rewrite the statute, openly discarding what they (correctly) understood to be the plain meaning of the words chosen by the legislature. Id., ¶38.

¶63 The second group, known as the "ambiguity faction," consisted of three justices who agreed the statute was ambiguous and who resolved the ambiguity in favor of the insured. Id., ¶18 (majority op.). Like the absurdity faction, they conceded the plain meaning of the statute:

> The literal reading of Wis. Stat. § 632.32(5)(i)2. favored by [the insurer] permits the conclusion that an insurer may reduce uninsured motorist limits by the amount of worker's compensation payments made to anyone. Subsection (5)(i)2. contains no qualifying language specifying to whom the payments must be made; payments could be made to the insured, to the Fund, or to anyone.

Id., ¶22 (lead op.). This faction noted the insurer's "literal interpretation" could reduce the limits to $0. Id., ¶28. Finding that result unpalatable, these justices read into the

15

statute "an implicit condition that the insurer may reduce uninsured motorist benefits only by the amount of worker's compensation payments made to or on behalf of the insured." Id., ¶23. This implicit condition was supported, the three claimed, by § 632.32(4) (2001-02), which required that every motor vehicle insurance policy include uninsured motorist coverage. Id., ¶24. Under the ambiguity faction's extra-textual reasoning, "[t]he consistent leading purpose of this statutory scheme is to require that insurers provide uninsured motorist coverage for the protection of their insureds," while "the subordinate purpose is to minimize the insurers' exposure by allowing insurers to limit the protection offered by uninsured motorist coverage to a fixed, predetermined amount that takes into account payments from specified sources[.]" Id., ¶27. According to the ambiguity faction, the purported "leading purpose" would be defeated if not for the read-in implicit condition.

¶64 The two factions achieved their desired result——defeating the contractual reduction——after joining together in a lengthy discussion of legislative history and public policy, rather than text. Id., ¶¶44-62 (majority op.). Then-Chief Justice Shirley S. Abrahamson concurred with the mandate but joined neither the absurdity faction nor the ambiguity faction. Id., ¶66 (Abrahamson, C.J., concurring).

C. Evaluating the Parties' Arguments: Teschendorf's Limited Reach

¶65 In this case, the parties' arguments primarily address the reach of Teschendorf and, more generally, the absurd results

16

canon. Secura does not ask this court to overturn Teschendorf. In fact, it concedes the reducing clause may not be read to cause a subtraction from the limits for the $20,000 paid to the Fund——because of Teschendorf. Instead, Secura simply argues that Teschendorf does not apply to the $10,000 in worker's compensation benefits, which were paid to the Estate and later repaid. Secura asserts the court of appeals erred in extending Teschendorf too far. In contrast, the Estate argues Teschendorf should be the focal point of this court's analysis and prohibits the reduction at issue.

¶66 As a preliminary matter, Secura argues Teschendorf is largely "non-binding" because no majority agreed on a rationale, citing State v. Elam, 195 Wis. 2d 683, 685, 538 N.W.2d 249 (1995) (per curiam). In Elam, this court explained that "[a] general principle of appellate practice is that a majority of the participating judges must have agreed on a particular point for it to be considered the opinion of the court." Id. (citing State v. Dowe, 120 Wis. 2d 192, 194-95, 352 N.W.2d 660 (1984) (per curiam)). Critically, no majority in Teschendorf held the particular result absurd, and no majority held the statute ambiguous——a majority formed almost exclusively on a discussion of legislative history and public policy. As this court has explained, a dearth of overlap between rationales on which a mandate was based is "troublesome." Koschkee v. Taylor, 2019 WI 76, ¶8 n.5, 387 Wis. 2d 552, 929 N.W.2d 600. Teschendorf's application to this case is a prime example: In applying Teschendorf, how much weight should this court place on its

17

specific facts and the purported absurdity of the insurer's proffered interpretation?  The lack of a majority rationale in Teschendorf provides sufficient justification to limit the decision's application to its extreme facts because determining how Teschendorf applies to even a slightly different fact-pattern is difficult.  See Bryan A. Garner et al., The Law of Judicial Precedent 198-99 (2016).  See generally Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶243, 400 Wis. 2d 626, 971 N.W.2d 402 (Rebecca Grassl Bradley, J., dissenting), summarily rev'd sub. nom. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. __, 142 S. Ct. 1245 (per curiam) (explaining this court does not follow the so-called "Marks rule," pursuant to which a legal rule may be precedential even if its rationale was not adopted by a majority).

¶67 Although noting this divide, Secura restricts its argument to attacking the rationale advanced by the ambiguity faction in Teschendorf, because the absurdity faction's analysis would not extend to the significantly less extreme facts of this case.  In contrast to Teschendorf, the Estate in fact receives insurance proceeds approaching the policy limit, and the variance between the parties' positions approximates $10,000.  Secura asserts "the only way the [a]mbiguity [f]action could find an alternative to the 'literal' meaning [wa]s by adding a qualification into the statute . . . that is simply not there." (Citation omitted.)  Judges may not, however, either add words to or subtract words from the text of the law.  See State v. Hinkle, 2019 WI 96, ¶24, 389 Wis. 2d 1, 935 N.W.2d 271 ("It is a

18

cardinal 'maxim[] of statutory construction . . . that courts should not add words to a statute to give it a certain meaning.'" (quoting State v. Fitzgerald, 2019 WI 69, ¶30, 387 Wis. 2d 384, 929 N.W.2d 129) (modification in the original)). As Judge Grogan explained in her concurrence, the text of the law does not state "the 'payment' must be made to the insured" even though this court in Teschendorf so held. Secura Supreme Ins., 399 Wis. 2d 542, ¶21 (Grogan, J., concurring) (quoting Teschendorf v. State Farm Ins., 2005 WI App 10, ¶¶19-20, 278 Wis. 2d 354, 691 N.W.2d 882 (2004) (Fine, J., dissenting), aff'd, 293 Wis. 2d 123). Nor, as Judge Grogan also noted, does the text "address what happens after a worker's compensation payment is made but is subsequently partially paid back, which is the factual scenario presented in this case." Id. Secura is correct to argue the ambiguity faction's rationale should be rejected; it is antithetical to fundamental rules of textual interpretation.

¶68 In effect, the ambiguity faction searched for ambiguity, which this court has repeatedly rejected as inappropriate. See, e.g., Lamar Cent. Outdoor, LLC v. Div. of Hearings & Appeals, 2019 WI 109, ¶18, 389 Wis. 2d 486, 936 N.W.2d 573 ("We do not, however, look for ambiguity because '[s]tatutory interpretation involves the ascertainment of meaning, not a search for ambiguity.'" (quoting State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, ¶47, 271 Wis. 2d 633, 681 N.W.2d 110) (modification in the original)). A good lawyer can render a sentence as straightforward as "the sky

is blue" ambiguous if he stares at it long enough; perhaps the sky is just sad.  Merely because the argument can be made that the sky is sad does not mean a reasonable person would actually ascribe that meaning to the sentence "the sky is blue." Ambiguity must be facially present in a statute, and it certainly does not come into existence merely because three justices are troubled by a result dictated by plain meaning. See Antonin Scalia & Bryan A. Garner, Reading Law:  The Interpretation of Legal Texts 174 (2012) ("A provision that seems to the court unjust or unfortunate . . . must nonetheless be given effect.").

¶69  While the court in Teschendorf agreed on very little, it should disturb this court that six justices acknowledged a "literal" reading of the statute supported the insurer.  293 Wis. 2d 123, ¶¶24, 32 (lead op.).  A literal reading is not necessarily the same as a plain reading, but the absurdity faction noted the insurer's reading was not only "literal" but "plain[.]"  Id., ¶32.  See generally Brey, 400 Wis. 2d 417, ¶11 (explaining "the plain-meaning approach is not 'literalistic'" (quoting Kalal, 271 Wis. 2d 633, ¶52)).  Self-evidently, a plain meaning cannot be ignored by merely labelling it literal, as the ambiguity faction did in discarding it.

¶70  The ambiguity faction's addition of what it deemed an "implied condition" is reminiscent of a time when "the monarch . . . [was considered by some] a one-man legislator."  Scalia & Garner, Reading Law, at 349.  Centuries ago, one treatise

20

embraced judicial law-making in an early exposition of the usefulness of divining legislative intent:

> [I]n order to form a right judgment when the letter of a statute is restrained, and when enlarged, by equity, it is a good way, when you peruse a statute, to suppose that the lawmaker is present, and that you have asked him the question you want to know touching the equity; then you must give yourself such an answer as you imagine he would have done, if he had been present . . . . And if the lawmaker would have followed the equity, notwithstanding the words of the law . . . , you may safely do the like.

Edmund Plowden, Note to Eyston v. Studd, (1574) 2 Plow. 459a, 467, as reprinted in Scalia & Garner, Reading Law, at 349 (ellipses in the original). Centuries later, the people of Wisconsin vested the law-making power exclusively in a representative body of the people. See Wis. Const. art. IV, § 1. To ask what the king would want may yield an answer, but to divine what hundreds of legislators would want is impossible. See Scalia & Garner, Reading Law, at 349. Collective intent is nothing more than a "fiction" because each legislator has his own "subjective views[.]" Id. at 392; see also Town of Wilson, 390 Wis. 2d 266, ¶68 ("Crafting judicial doctrines based on the collective intent of a large body relies on the false premise that a deliberative body acts with a single purpose." (citing John W. MacDonald, The Position of Statutory Construction in Present Day Law Practice, 3 Vand. L. Rev. 369, 371 (1950))). Additionally, to ask the latter has the potential to invite "judicial mischief," Scalia & Garner, Reading Law, at 350, because "judicial predictions of how the legislature would have decided issues it did not in fact decide are bound to be little

21

more than wild guesses, and thus lack the legitimacy that might be accorded to astute guesses." Frank Easterbrook, Statutes' Domains, 50 U. Chi. L. Rev. 533, 548 (1983).

¶71 While members of the judiciary may have valid and good ideas for improving the law, the people deny us the authority to make such policy decisions, having vested the law-making power exclusively in the legislature. The desirability of such "improvements" undoubtedly depends on how one may be affected by the rewritten law. "Although judges may profess well-intentioned justification for 'improving' the law, 'interpretative approaches can be used for all kinds of purposes, not just beneficent ones.'" Friends of Frame Park, U.A. v. City of Waukesha, 2022 WI 57, ¶96, 403 Wis. 2d 1, 976 N.W.2d 263 (Rebecca Grassl Bradley, J., concurring) (quoting Bryan A. Garner, Old-Fashioned Textualism Is All About Interpretation, Not Legislating from the Bench, ABA J., Apr. 2019). "The people of Wisconsin elect judges to interpret the law, not make it." Id.

¶72 The ambiguity faction's rationale was nothing more than a dangerous "venture" down the "path of judicial legislation" to reach a result deemed "desirable[.]" See State ex rel. Crow v. West Side St. Ry. Co., 47 S.W. 959, 961 (1898). Such an action aggregates law-making power to the judiciary, thereby consolidating in one branch governmental powers the people deliberately kept separate to avoid tyranny. See League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶35, 387 Wis. 2d 511, 929 N.W.2d 209.

22

¶73 After attacking its rationale, Secura suggests the absurdity faction may have framed the case correctly, but would limit the reach of the absurdity doctrine to a "truly anomalous" situation identified after an "exacting analysis." Secura points out, "[h]ad the insurer prevailed in Teschendorf, the insured's estate would have received nothing because the employer's payments exceeded the . . . limits." In contrast, the Estate would receive just about five percent less if this court adopted Secura's argument. The Estate counters that Huck bargained for a "predetermined, fixed level of coverage"——$250,000——and Secura's interpretation of the policy would deny the Estate the benefit of Huck's bargain, a result it declares "absurd."

¶74 A historical analysis of the absurdity doctrine supports Secura's argument that even if the absurdity faction in Teschendorf was correct (it wasn't), that faction's rationale does not extend to this case. Defining absurdity is challenging, but two "archetypal" examples of an absurd result exist in common law. Veronica M. Dougherty, Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation, 44 Am. U. L. Rev. 127, 139 (1994). One scholar wrote that these two examples are "the nearest thing we have to a legal definition of absurdity." Id. Both examples developed in the context of statutory interpretation, but the absurd results canon is materially the same as applied in contract interpretation. The examples were summarized and the

absurd results canon applied long ago by the United States Supreme Court in the following oft-quoted passage:

> The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted, 'that whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit.  The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire——'for he is not to be hanged because he would not stay to be burnt.'  And we think that a like common sense will sanction the ruling we make, that the act of Congress which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder.

United States v. Kirby, 74 U.S. 482, 487 (1868).

¶75 To equate the Estate receiving $189,000 instead of $199,000 with the two archetypal examples of absurdity would be, well, absurd.  The two examples are qualitatively different than the Estate's received insurance proceeds.  History tells us punishing a person for trying to preserve life would work a grievous moral injustice.  Punishing a doctor who provides life-saving care or a prisoner who escapes a burning prison would not violate only common sense——it would violate natural law.  See 1 William Blackstone, Commentaries *129 ("THE right of personal security consists in a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation."); see also Wis. Const. art. I, § 1 ("All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of

24

happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."). Punishing a mail carrier for temporarily detaining mail while the carrier was detained by the State would be Kafkaesque and contrary to the common law tradition of prohibiting punishment for involuntary acts. See actus reus, Black's Law Dictionary (11 ed. 2019).

¶76 The two archetypal examples demonstrate "the absurd . . . results canon applies only rarely and in rather narrow circumstances[.]" Container Life Cycle Mgmt., LLC v. Wis. Dep't of Nat. Res., 2022 WI 45, ¶79, 402 Wis. 2d 337, 975 N.W.2d 621 (Rebecca Grassl Bradley, J., dissenting). "Just because a court dislikes the outcome does not mean it is absurd." Id. (quoting Schwab v. Schwab, 2021 WI 67, ¶44 n.1, 397 Wis. 2d 820, 961 N.W.2d 56 (Rebecca Grassl Bradley, J., dissenting)). Properly understood, absurdity is not about "practical[ity]" or "fit" because "people differ over what is sensible and what is desirable," which is why "we elect those who write our laws——and expect courts to observe what has been written." Backus v. Waukesha County, 2022 WI 55, ¶26, 402 Wis. 2d 764, 976 N.W.2d 492 (Rebecca Grassl Bradley, J., dissenting) (modification in the original) (quoting Scalia & Garner, Reading Law, at 22). An absurd result "consists of a disposition that no reasonable person could intend." Scalia & Garner, Reading Law, at 237.

¶77 Justice Joseph Story described the extraordinary facts necessary to disregard plain language to avoid absurdity:

25

> [I]f, in any case, the plain meaning of a provision . . . is to be disregarded, because we believe the framers of that instrument could not intend what they say, it must be one, where the absurdity and injustice of applying the provision to the case would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application.

1 Joseph Story, Commentaries on the Constitution of the United States § 427 (1833). The Estate's primary argument would have this court lower the threshold for application of the absurdity doctrine from "monstrous" to merely unfavorable. In ruling for the Estate, the majority implicitly endorses a new rule declaring that when happenstance——i.e., an event outside the control of the insured——reduces the "predetermined, fixed level of coverage," the result is legally absurd, justifying judicial revision of the insurance contract.

¶78 If results are to drive interpretation of insurance policies, the majority should consider the consequent increase in insurance premiums, which alone demonstrates that the effect of Secura's proffered interpretation is not "so monstrous, that all mankind would, without hesitation, unite in rejecting the application." Id. In its discussion of the absurd results canon, a leading treatise on Wisconsin insurance law repeats the maxim, "an insurance company should not be bound to risks it did not contemplate and for which it did not receive a premium." 1 Sheila M. Sullivan, Anderson on Wisconsin Insurance Law § 1.34 (8th ed. 2022). "[W]hen the terms of a policy are plain on their face, the policy should not be rewritten . . . to bind the insurer to a risk it was unwilling to cover, and for which it was not paid." Olguin v. Allstate Ins., 71 Wis. 2d 160, 164-65,

26

237 N.W.2d 694 (1976). Happenstance often plays a role in determining how a policy applies. Ambiguity in a policy is almost always resolved against an insurer, but if unambiguous policy provisions can also be interpreted against an insurer whenever judges think the language would produce unfair results, insurers are left with increased risk uncertainty and will price their policies accordingly.[6]

¶79 As amicus Wisconsin Insurance Alliance et al. (WIA) explains: "Insurers underwrite and issue policies in belief that policies – and the statutes with which the policies must comply – will be interpreted and enforced as written. Deviating from this precept injects uncertainty and additional costs into an already heavily-regulated industry." Reducing clauses, especially, "are valued by insurers because they serve to reduce the cost of premiums to policyholders." Therefore, "[t]he decision below fosters confusion and undue complexity and will

---

[6] Usually, this court has interpreted ambiguity against an insurer. See, e.g., Marks v. Houston Cas. Co., 2016, WI 53, ¶42, 369 Wis. 2d 547, 881 N.W.2d 309 (citing Estate of Sustache v. Am. Family Mut. Ins., 2008 WI 87, ¶21, 311 Wis. 2d 548, 751 N.W.2d 845). In at least one case, however, this court used the absurd results canon to side with the insurer's interpretation of an ambiguous policy provision. Kopp v. Home Mut. Ins., 6 Wis. 2d 53, 57-58, 94 N.W.2d 224 (1959) ("Even though the policy provision is ambiguous and must be construed against the insurer, the unreasonable result should be avoided of so construing the medical payments clause of defendant's policy as to permit the injured person to recover for medical or hospital services supplied to him by some third party volunteer without cost or personal liability to pay therefor on the part of such injured person."). That case demonstrates the possible "absurdity"——if that word will be used so loosely——of holding insurers liable for risks never contemplated and for which no premium has been paid.

27

harm insurers and consumers by placing upward pressure on the cost of insurance."

¶80 Lowering the threshold for absurdity would effect a substantial change in the law. The purpose of UIM coverage is to "substitute[] for insurance that the tortfeasor should have had." Teschendorf, 293 Wis. 2d 542, ¶24 (quoted source omitted). Had Huck been hit by a negligently-driven motor vehicle that was not underinsured (i.e., by a vehicle covered under a policy with $250,000 limits), the Estate would have received about $10,000 less than it would receive in this case under Secura's proffered reading. But for the negligently driven motor vehicle being underinsured, the reducing clause would have no relevance. The Estate would have received $250,000 in settlement, plus a $36,000 payment of worker's compensation benefits, for a total of $286,000. Wisconsin Statute § 102.29(1), however, would have required the Estate to refund the $36,000 in total. Additionally, the worker's compensation carrier would have been entitled to $20,000 of the settlement under Wis. Stat. § 102.29(2). After these statutorily-required deductions, the Estate would have received only $230,000. Accordingly, Secura accurately notes, "Huck purchased UIM insurance to protect against being injured by a tortfeasor with liability limits less than $250,000. . . . [The Estate] received exactly that—and more—since the Estate recovered more than if the tortfeasor had been insured to

28

$250,000."[7] The Estate has no response to this fact. As Secura accurately observes, under a plain language interpretation of the policy, "the Estate's recovery is greater than zero——already distinguishing this case from Teschendorf——and more than if the tortfeasor had liability limits of $250,000."

¶81 Expanding the absurd results canon to override the text whenever judges deem the results "nonsensical," as the Estate would have it, would unsettle the reasonable expectations of contracting parties, not to mention leave the law vulnerable to judicial revision. The language of the reducing clause plainly contemplates reducing the limits by all sums paid in worker's compensation benefits. $36,000 was a sum paid. Nothing in the policy language gives the reimbursement any relevance. Reimbursement of money paid does not change the simple fact that money was, in fact, paid. While this result may seem "unfair," nothing gives this court the authority to disregard the plain language of an insurance policy. Teschendorf was wrongly decided but may be distinguished based on its materially different facts. Either way, Teschendorf has no bearing on a textual interpretation of the policy in this case.

D. The Analysis of Wis. Stat. § 632.32(5)(i)2.

¶82 The majority/lead opinion (in a part joined only by the author and one other justice) concludes Secura's proffered

---

[7] WIA similarly observes, "the outcome advanced by SECURA is not absurd at all because it results in the insured recovering a greater amount than if the tortfeasor had liability coverage equivalent to the insured's UIM limits."

interpretation of the reducing clause is not authorized by Wis. Stat. § 632.32(5)(i)2. Majority/lead op., ¶¶19-28. This non-precedential analysis is unnecessary given the opinion's conclusion that Secura's interpretation of the reducing clause is incorrect. Regardless, that analysis is wrong.

¶83 The majority/lead opinion's analysis works only by improperly adding a word to Wis. Stat. § 632.32(5)(i)2. Section 632.32(5)(i)2. authorizes a reduction by "[a]mounts paid or payable under any worker's compensation law[.]" The majority/lead opinion inserts the word "current" before "amounts paid," so the statute becomes: "Current amounts paid or payable under any worker's compensation law[.]" Id., ¶27 ("'Amounts paid' is interpreted as the current 'amounts paid' or outstanding such as by an installment agreement, at the time an insurer seeks to reduce its liability under § 632.32(5)(i)."). Problematically for the majority/lead opinion, the text does not use the phrase "current amounts paid." It does not include any temporal limitation on how the amount paid is to be calculated. Without rewriting the statute, the majority/lead opinion's analysis fails.

IV. CONCLUSION

¶84 This case demonstrates that "the law is such an Ass." George Chapman, Revenge for Honour, A Tragedie 37 (1654). If, however, we are to be a "government of laws, and not of men," that is the price we must occasionally pay. John Adams, Novanglus: A History of the Dispute with America, from Its Origin, in 1754, to the Present Time, in Revolutionary Writings

30

of John Adams (C. Bradley Thompson ed. 2000).  Because I would leave the revision of our laws with the legislature where that work belongs, I respectfully dissent.